[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13001

_____

Agency No. 001143-05


1143-05

DAVID B. GREENBERG,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee,

_____

1335-06

DAVID B. GREENBERG,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee,

_____

20676-09

DAVID B. GREENBERG,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee,

_____

20677-09

DAVID B. GREENBERG,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee,

_____

20678-09

DAVID B. GREENBERG,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

2

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(August 20, 2021)

Before NEWSOM, BRANCH, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

This appeal primarily concerns the interpretation of provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324, in effect during the tax years at issue.[1] David Greenberg appeals the Tax Court's memorandum opinion upholding adjustments contained in five notices of deficiencies ("NODs") issued by the Internal Revenue Service against him for the tax years 1999, 2000, and 2001, as well as the Tax Court's adoption of the Commissioner of Internal Revenue's computations under Tax Court Rule 155 and its denial of several of Greenberg's posttrial motions. After careful review and with the benefit of oral argument, we affirm the Tax Court's decision.

## I.     RELEVANT BACKGROUND

This case concerns the appeal of five cases filed by Greenberg that were consolidated by the Tax Court in Tax Court Docket Nos. 1143-05, 1335-06, 20676-

_____

[1] The TEFRA partnership procedures relevant to this case were prospectively repealed by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625, effective for taxable years beginning on or after January 1, 2018. *See Highpoint Tower Tech., Inc. v. Comm'r*, 931 F.3d 1050, 1052 n.2 (11th Cir. 2019).

09, 20677-09, and 20678-09.[2]  At issue in this case is a type of tax shelter known as "Son-of-BOSS."[3]  As this Court has noted:

> There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership.  The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis.  If so, the result is that the partners will have a basis in the partnership so great as to provide for large—but not out-of-pocket—losses on their individual tax returns.  Enormous losses are attractive to a select group of taxpayers—those with enormous gains.

*Highpoint Tower Tech. Inc. v. Comm'r*, 931 F.3d 1050, 1052–53 (11th Cir. 2019) (quoting *Kligfield Holdings v. Comm'r*, 128 T.C. 192, 194 (2007)).

Specifically, the type of Son-of-BOSS transactions involved in the instant case is the Short Option Strategy ("SOS") transaction.  The Tax Court below aptly explained SOS transactions as follows:

> The SOS transaction required clients to (1) buy from a bank a foreign-currency option that involved both a long and a short position; (2) transfer the long position to a partnership, which also assumed the

---

[2] The Tax Court also consolidated five cases filed by William Goddard and five cases filed by his former wife, Michelle Goddard, relating to the transactions at issue in this appeal.  The Tax Court's opinion addressed the five cases as to William Goddard, which he initially appealed to this Court.  However, on October 8, 2020, we granted the Commissioner's motion to transfer William Goddard's appeal to the Ninth Circuit.  As to Michelle Goddard, the Tax Court has yet to rule on her pending cases, as she is seeking innocent-spouse relief under I.R.C. § 6015 pending the outcome of William Goddard's case.  Thus, this appeal only concerns the five consolidated cases as to Greenberg.

[3] "BOSS" is an acronym for "bond and options sales strategy."  *Kligfield Holdings v. Comm'r*, 128 T.C. 192, 194 (2007).

client's obligation under the short position; and then (3) withdraw from the partnership and receive a liquidating distribution of foreign currency, which the client would sell at a loss.

*Greenberg v. Comm'r*, T.C. Memo. 2018-74, at *8 (footnote omitted).

Before delving into this case's factual and procedural background, we first explain the statutory framework governing the taxation of partnerships during the relevant time period, given the complexity of the tax transactions before us.

## A.    Statutory Overview

"A partnership does not pay federal income taxes; instead, its taxable income and losses pass through to the partners." *United States v. Woods*, 571 U.S. 31, 38 (2013); *accord* I.R.C. § 701. A partnership must report its tax items for the taxable year on an information return (generally, a Form 1065) and must issue to each partner such information showing that partner's distributive share of the partnership's tax items (generally, a Schedule K–1). *See* I.R.C. § 6031. In turn, the individual partners must report their distributive shares of the partnership's tax items on their own respective income tax returns. *See id.* §§ 702, 704, 6222(a); *Woods*, 571 U.S. at 38.

As noted above, during the taxable years at issue in this case, partnership audits and litigation were governed by provisions of TEFRA, which were formerly

5

found in I.R.C. §§ 6221 through 6234.[4]  Before the enactment of TEFRA, the IRS was unable to correct errors on a partnership's return in a single, unified proceeding; instead, tax matters pertaining to the individual partners were conducted through deficiency proceedings at the individual-taxpayer level.  *See Highpoint*, 931 F.3d at 1053.  To address those difficulties, Congress enacted TEFRA, which created a "two-step process for addressing partnership-related tax matters."  *Id.*  As the Supreme Court explained in *Woods*:

> First, the IRS must initiate proceedings at the partnership level to adjust "partnership items," those relevant to the partnership as a whole. §§ 6221, 6231(a)(3).  It must issue [a Final Partnership Administrative Adjustment ("FPAA")] notifying the partners of any adjustments to partnership items, § 6223(a)(2), and the partners may seek judicial review of those adjustments, § 6226(a)–(b).  Once the adjustments to partnership items have become final, the IRS may undertake further proceedings at the partner level to make any resulting "computational adjustments" in the tax liability of the individual partners. § 6231(a)(6). Most computational adjustments may be directly assessed against the partners, bypassing deficiency proceedings and permitting the partners to challenge the assessments only in post-payment refund actions. § 6230(a)(1), (c).  Deficiency proceedings are still required, however, for certain computational adjustments that are attributable to "affected items," that is, items that are affected by (but are not themselves) partnership items.  §§ 6230(a)(2)(A)(i), 6231(a)(5).

571 U.S. at 39.

---

[4] Unless otherwise indicated, all Internal Revenue Code provisions and Treasury Regulations cited to in this opinion refer to those in effect during the relevant time period, i.e., the tax years 1997 to 2001, during which time the provisions and regulations were substantially the same.  TEFRA has since been repealed.  *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101, 129 Stat. 584, 625.

Additionally, all partnerships—i.e., any partnership required to file a return under § 6031(a)—were subject to the TEFRA partnership procedures, unless the partnership qualified as a "small partnership." I.R.C. § 6231(a)(1). A small partnership was "any partnership having 10 or fewer partners each of whom [was] an individual . . . , a C corporation, or an estate of a deceased partner." *Id.* § 6231(a)(1)(B)(i). But a small partnership could elect out of the small partnership exception and choose to have TEFRA apply to it for the taxable year and all subsequent taxable years. *Id.* § 6231(a)(1)(B)(ii). As discussed below, Greenberg and the Commissioner dispute whether this election could have been taken by a partnership that did not qualify as a small partnership for the partnership taxable year in order to have TEFRA apply should the partnership qualify as a small partnership in the future.

Furthermore, each partnership designated a "tax matters partner" ("TMP") to act on its behalf in dealings with the IRS. *See* I.R.C. § 6231(a)(7). And, if the IRS did issue an FPAA following a partnership audit, the TMP was permitted to challenge those adjustments to the partnership items in the Tax Court. *Id.* §§ 6223(a), (d), 6226. TEFRA also contained exceptions under which an affected partner's taxes would be determined as if he or she had personally engaged in the partnership's transactions. For example, when a partner was under criminal investigation for violation of the internal revenue laws relating to income tax, the

7

IRS was permitted to send that partner a conversion notice informing the partner that his or her partnership items for the partnership taxable shall be treated as nonpartnership items. *See id.* §§ 6231(b)(1)(D), (c); Treas. Reg. § 301.6231(c)-5T.

With this statutory framework in mind, we turn to the factual and procedural background of the case.

## B.    Factual Background[5]

Greenberg is a certified public accountant who earned a degree in business and finance and a master's in accounting and who previously worked as a tax accountant at accounting firms such as Arthur Andersen, KPMG, and Deloitte. Greenberg met Goddard, an attorney, while working at Arthur Andersen.

### 1.    The Purported Transactions

In January 1997, Greenberg and Goddard formed GG Capital, a California partnership that did not have a written partnership agreement. Goddard's law partner, Raymond Lee, later became a partner at GG Capital. A Panamanian investment company known as Solatium Investments Inc. ("Solatium") was also briefly a partner of GG Capital, but Solatium left the partnership by 1998. Greenberg claims that GG Capital ran an active investment business in digital-option spreads for both itself and its clients, i.e., a purpose completely unrelated to generating tax

---

[5] In his initial brief, Greenberg states that he accepts and adopts the Tax Court's factual determinations. As such, much of our factual recitation comes from the Tax Court's well-written opinion.

losses, although the Tax Court did not find many facts in support of his claim. Greenberg and Goddard also both assigned large amounts of their income from their "day jobs" to GG Capital, with Greenberg's assigned income coming from KPMG and Deloitte. GG Capital reported, as ordinary income from Greenberg, $617,000, $898,000, and $851,000 for the tax years of 1999, 2000, and 2001, respectively. The Commissioner asserted to the Tax Court that this assignment of income was designed to offset ordinary income with the artificial losses GG Capital planned to generate.

During 1997 and 1998, GG Capital was purportedly involved with several transactions that resulted in inflating bases in various entities. According to Greenberg, GG Capital, in October 1997, acquired a 20% interest in a company known as DBI Acquisitions II ("DBI") and was credited with a $4 million capital account; Milestone Acquisitions, an entity controlled by a client of Goddard's law firm, controlled the other 80% of DBI. Next, Solatium borrowed 70 million Dutch guilders, and GG Capital, Solatium, and Pacific Coin—a partnership that operated pay phones, was one of Goddard's clients, and was related to a company called Pacific Coin Management ("PCM")—formed a company called Connect Coin, LLC ("Connect Coin"). The three Connect Coin partners allegedly made the following capital contributions: (1) Pacific Coin agreed to pay fees and costs for Connect Coin worth $250,000; (2) GG Capital agreed to have its partners provide legal and

9

accounting services to Connect Coin; and (3) Solatium contributed 9,225,000 guilders—which the partners agreed was the present value of 70 million guilders in thirty years—with Connect Coin assuming Solatium's previously assumed obligation to make a balloon payment of 70 million guilders to Delta Lloyd Bank in thirty years. Connect Coin converted the guilders into $4.5 million and lent that amount to Pacific Coin.

As a result of Connect Coin's assumption of the guilder debt, Solatium recognized a gain and increased its basis in Connect Coin by about $35 million. The parties then allegedly entered into an agency agreement under which Connect Coin agreed it would act as Pacific Coin and PCM's agent. Solatium was treated as having made capital contributions to, and acquiring interests in, both PCM and Pacific Coin and claimed bases of $27 million in PCM and $8 million in Pacific Coin. Solatium then contributed its 1% interest in Connect Coin to GG Capital, increasing the latter's interest in Connect Coin from 4% to 5%. Greenberg and Goddard claimed that this contribution gave GG Capital Solatium's interests and carryover bases in Pacific Coin and PCM. GG Capital then contributed its interest in Pacific Coin to PCM, increasing its purported basis in PCM to $35 million, which was reduced by a tax loss of $1 million on a Schedule K-1 that Pacific Coin issued to GG Capital. In December 1998, GG Capital contributed its interest in PCM to DBI, which allegedly resulted in a $34 million basis in DBI. But, as the Tax Court found, there

are no documents in the record showing that any of these transactions actually happened.

In 1998, Greenberg and Goddard formed JPF III, a partnership that did SOS transactions for GG Capital. In 1999, Greenberg became a partner at KPMG and a member of Stratecon, a KPMG group that designed and sold tax shelters, including the SOS transaction, to corporate clients. Greenberg was heavily involved in the promotion of SOS transactions while at KPMG.

Over the next three years, a series of transactions involving JPF III and other entities occurred. On November 17, 1999, JPF III entered into an option spread with Lehman Brothers, Inc., that had two "legs": (1) a European digital call option sold by Lehman to JPF III (the "long leg"), which cost $10 million and required Lehman to pay JPF III $47 million if the spot rate on the yen/dollar exchange rate was greater than or equal to 112.46 yen/dollar; and (2) a European digital call option sold by JPF III to Lehman (the "short leg"), which cost $9.8 million and required JPF III to pay Lehman $46 million if the spot rate was greater than or equal to 112.47 yen/dollar. The only money that actually changed hands, however, was the $200,000 net premium JPF III paid to Lehman. And both legs of the option spread expired on November 16, 2000, as the highest yen/dollar exchange rate on that day was below the agreed to spot rates.

11

The same year, JPF III bought a membership interest in AD Global Fund shortly after the latter was formed in October 1999. AD Global was formed by the Diversified Group, Inc., and Alpha Consultants, which were initially the only members (with each contributing $50,000) and which acted as its managers. AD Global was designed to look like an investment company, with its purpose being to invest in foreign currencies, futures contracts, and options. However, AD Global's members used it as a vehicle to conduct SOS transactions by entering into foreign-currency option spreads and contributing them to AD Global in exchange for membership interest. Then, each member would claim its basis in AD Global equaled the premium on the spread's long option but would not reduce the basis by its obligation on the short option, and the spreads would either expire or be closed out early by Diversified. Shortly thereafter, the member would terminate or sell its interest to AD Global.

In buying the AD Global membership interest, JPF III contributed its option spread with Lehman in exchange for a 33% membership interest; at the time, AD Global had seven members. While the net premium of the Lehman spread was $200,000, the parties only valued it at $100,000. JPF III claimed its basis in AD Global equaled the value of the long-option premium it contributed but did not reduce its basis for the value of the short-option liabilities assumed by AD Global. One month after JPF III became a member, it withdrew from AD Global and

received 82,800 in Canadian dollars,[6] which Greenberg converted into $57,000 within a week. Greenberg asserts that JPF III engaged in these transactions on behalf of GG Capital, but the Tax Court found the record "murky" as, while there was an agency agreement, the contribution agreement JPF III signed with AD Global stated that JPF III was acting on its own. Additionally, Greenberg claimed that GG Capital realized a loss at the end of 1999 by selling 49% of the spread's long leg to him and Goddard. However, as the Tax Court noted, the paper trail for this purported sale, i.e., bank records and prior written consent from Lehman to transfer the 1999 option spread, was nonexistent, and there was nothing other than the testimonies of Greenberg and Goddard to suggest the sale actually happened.

Similar transactions occurred in 2000 and 2001. On September 27, 2000, JPF III entered into a digital option spread with Deutsche Bank, the terms of which were similar to the 1999 option spread involving the yen/dollar exchange rate. The only money that changed hands was the $750,000 net premium that JPF III paid to Deutsche Bank. Greenberg similarly claims that JPF III bought this option spread on behalf of GG Capital and that GG Capital sold 13% of the long leg to Greenberg and Goddard, generating part of GG Capital's loss for the 2000 tax year. Except for Greenberg's and Goddard's testimony, there is no evidence in the record

---

[6] AD Global obtained the Canadian dollars used to buy back JPF III's interest from a Canadian dollar option spread in 1999 that ultimately expired, with AD Global receiving 147,680 in Canadian dollars.

demonstrating the sale occurred. On November 27, 2000, JPF III entered into another digital option spread with Deutsche Bank, which was designed in a similar way and had a netting provision totaling $30,000. While the taxpayers again testified that this sale was on behalf of GG Capital, which resulted in generating a portion of GG Capital's loss for 2000, there is no record evidence suggesting the sale occurred beyond their testimonies. And, on November 30, 2001, an entity known as PTC-A entered into a digital-option spread with Deutsche Bank designed in a similar way as the 1999 and 2000 option spreads. The net premium required PTC-A to pay Deutsche Bank $170,000. Greenberg asserts that PTC-A bought the option spread on behalf of GG Capital, with GG Capital purportedly selling the long leg to Greenberg and Goddard. But, as the Tax Court again noted, there is no paper trail that this occurred.

During this time period, the federal government began investigating KPMG. The investigation expanded, and Greenberg was later indicted for his role in designing and marketing the SOS transaction tax shelter at KPMG. Greenberg was eventually acquitted of criminal charges.

### 2.    The Tax Returns

Turning to the relevant tax returns, Greenberg prepared GG Capital's 1997 partnership return and signed it on behalf of himself and the other partners— Goddard, Solatium, and Lee. Attached to the return was a handwritten statement

14

stating, "The Partners of [GG Capital] do hereby elect under IRC Section 6231(a)(1)(B)(ii) to be subject to the provisions of 'Tefra' as defined in the IRC." Under this statement, Greenberg signed his initials and wrote his name. Additionally, the initials and names of Goddard and Lee were both written, followed by the words "by David Greenberg." And "SII"—in reference to Solatium—was written followed by "Solatium Investments Foreign PTNR with Beneficial Interest by David Greenberg." At the bottom of this page, a second handwritten statement provided: "The [GG Capital] partners have authorized Greenberg to sign on their behalf." At trial, Goddard testified that he authorized Greenberg to sign the statement on his behalf. However, neither Lee nor a representative of Solatium testified as to whether they had authorized Greenberg to sign the statement. Rather, Greenberg testified that both Lee and Solatium had orally given him the authority to sign on their behalf. Yet, at trial, Greenberg was unable to identify Solatium's principals; instead, he testified that he had spoken with a "guy named Tommy Battilia" who claimed to have authority to act on behalf of Solatium.

As to the relevant 1999 tax returns, AD Global reported an ordinary loss of $1.14 million related to the options contracts on its 1999 return. The K–1 addressed to JPF III allocated it $334,000 of ordinary losses, $57,000 of distributions, and $97,000 of capital contributions. JPF III's 1999 return had no entries for income, expenses, assets, or liabilities, but had two K–1s attached—one each for Greenberg

15

and Goddard. GG Capital's return included the ordinary income of Greenberg, Goddard, and Lee assigned from their day jobs ($617,000 from Greenberg and $1.3 million from Goddard and Lee). The return also reported $1.2 million in consulting income, which the Commissioner asserts came from the promotion of Son-of-BOSS tax shelters. GG Capital claimed a I.R.C. § 988[7] loss of $2.7 million and an ordinary loss from AD Global of $334,000, matching the ordinary loss reported on JPF III's K–1 from AD Global. The Commissioner asserted that those ordinary losses were what Greenberg (and Goddard) used to shelter their personal income. GG Capital also reported a $47,000 suspended loss from PCM. On his 1999 return, Greenberg reported $710,000 of income from Deloitte and $73,000 in income from GG Capital. The Deloitte income was then "reversed" in two entries titled "Reverse Deloitte." Greenberg earned about $1.2 million in 1999, but after the assignment of income and the GG Capital losses, he reported only $108,000 of income on his return.

On its 2000 return, GG Capital again included ordinary income assigned to it by the partners from their day jobs—$898,000 from Greenberg and $743,000 from Goddard. It reported the same type of losses as 1999 at a greater scale—GG Capital reported a $15.85 million ordinary loss it referred to as a § 988 loss and a suspended loss of $3.82 million. GG Capital reported ordinary income of $823,000. Greenberg

---

[7] Section 988 deals with the treatment of certain foreign currency transactions, including options.

again "reversed" out the income he received in 2000 from both Deloitte and KPMG. Greenberg brought in about $6 million of income, but after the income assignment and GG Capital's losses, he claimed only $86,500 was taxable on his return. Additionally, on its 2000 California partnership return, GG Capital claimed a $3.2 million loss for "DBI Acquisitions Prior Suspended Losses Allowed" (the "DBI loss"), which Greenberg claims it is entitled to because GG Capital abandoned its interest in DBI—after its basis was inflated through a series of convoluted maneuvers—in 2000. This loss was not separately stated on GG Capital's federal return. Although Goddard testified that GG Capital claimed that loss on its return, the Tax Court could not clearly find where on the return, and the Commissioner asserted that Greenberg and Goddard camouflaged this loss in the § 998 loss.

On their 2001 returns, Greenberg reported similar assignments of income and convoluted losses, and GG Capital claimed ordinary income that Greenberg and Goddard claim they assigned—$854,000 from Greenberg for KPMG and $1.1 million from Goddard. And GG Capital reported $7.4 million of "royalties & other" income, which the Commissioner asserts comes from Son-of-BOSS promotion and was offset with artificial losses, as was done in prior years. GG Capital also reported an "FX digital loss" of over $38 million plus a "prior suspended loss" of $600,000, less a suspended loss of $29 million—netting out to about a $9 million loss, which the Commissioner believes is a 2001 version of the § 988 loss previously claimed.

17

GG Capital also reported a loss from a company, JPF V, LLC, of $95,000, but Greenberg did not introduce any evidence about that company at trial. GG Capital sent a K–1 to Greenberg that reported $103,000 in ordinary income, and Greenberg did the same reversal strategy from the previous years. Including his share of GG Capital's royalties and other income, Greenberg earned about $4.5 million in 2001, but with the losses from GG Capital, he reported only $61,000 in taxable income.

### C.     Procedural Background

#### 1.     The NODs

In October 2003, the Commissioner sent AD Global an FPAA for the 1999 tax year, in which he determined AD Global was a sham that was designed only to reduce its members' tax liabilities. The Commissioner disregarded the option spread contributed by JPF III and concluded that JPF III (and the other AD Global members) should not be treated as partners for tax purposes. And the Commissioner determined that JPF III should have taken the short leg of the option spread into account when calculating its basis. The Commissioner therefore disallowed $1.14 million of losses from the options and asserted penalties.

Then, in 2004, the Commissioner sent Greenberg an NOD for the 2000 taxable year (the "2004 NOD"), asserting a $4.7 million deficiency against Greenberg plus a 40% accuracy-related penalty. The Commissioner increased Greenberg's share of GG Capital's ordinary income by about $11 million by disallowing the DBI loss and

18

the § 988 loss, reallocated the income Greenberg tried to assign GG Capital from his day jobs, and allocated all of GG Capital's "royalties & other" income back to both him and Goddard.  In 2005, the Commissioner sent Greenberg an NOD for the 2001 taxable year (the "2005 NOD"), which: (1) increased his income from GG Capital by about $8.1 million; (2) disallowed the JPF V loss and the § 988 loss of $9.6 million claimed by GG Capital; (3) reassigned the day job income Greenberg had assigned to GG Capital; (4) allocated his proportion of GG Capital's "royalties & other" income for 2001; and (5) asserted 20% accuracy-related penalties.

In May 2008, the Commissioner sent Greenberg a letter notifying him that, because he was the subject of a criminal investigation for violation of the internal revenue laws relating to income tax, his partnership items with respect to AD Global would be treated as nonpartnership items under § 6231(c).  Then, in 2009, the Commissioner sent Greenberg converted-item NODs for the 1999, 2000, and 2001 tax years (the "2009 NODs").  Each of the 2009 NODs shared the same reasoning: AD Global was a sham formed only to lower its members' tax liabilities, and, as a result, the Commissioner disregarded AD Global, treating all transactions engaged in by AD Global as engaged in directly by its purported partners.  Thus, the Commissioner treated the option spreads as never having been contributed to AD Global and the losses purportedly realized by AD Global as realized directly by its members.  The 2009 NODs also provided that the purported partners of AD

19

Global—i.e., JPF III—should not be treated as partners.  And the 2009 NODs traced the effects up to Greenberg as an indirect partner through his partnership interest in JPF III.

To summarize, the assessed deficiencies and penalties against Greenberg include: (1) for the 1999 tax year, Greenberg was assessed a deficiency of $1,256,000 with a I.R.C. § 6662 penalty of $502,000 in the 2009 NODs; (2) for the 2000 tax year, he was assessed a deficiency of $4,687,000 with a $1,875,000 penalty in the 2004 NOD and a deficiency of $3,682,000 with a $1,473,000 penalty in the 2009 NODs; and (3) for the 2001 tax year, he was assessed a deficiency of $3,336,000 with a $ 1,334,000 penalty in the 2005 NOD and a deficiency of $242,000 with a $97,000 penalty in the 2009 NODs.

### 2.    Tax Court Proceedings

Greenberg disagreed with the Commissioner and filed five petitions in the Tax Court challenging the 2004 NOD, the 2005 NOD, and each of the 2009 NODs. Following Greenberg's acquittal of the criminal charges brought against him, these cases, now consolidated, proceeded.

Prior to trial, Greenberg filed several motions.  In two motions in limine, Greenberg requested that the Tax Court not consider any grounds not asserted in the NODs, reject any request from the Commissioner seeking leave to amend to allege additional grounds, and order that the Commissioner had the burden of proof should

the motion for leave to amend be granted. Greenberg also moved to dismiss the cases, alleging that the Commissioner failed to comply with TEFRA in adjusting GG Capital's items by not issuing it an FPAA, as GG Capital had elected to be subject to TEFRA's partnership rules. And Greenberg moved for summary judgment, asserting that the NODs were jurisdictionally invalid. The Tax Court denied each of these motions. The case then proceeded to trial in February 2011. At trial, ten witnesses testified, including Greenberg and Goddard.

Following trial, on March 31, 2015, Greenberg filed a motion to amend his petition in one of the consolidated cases (No. 1335-06). Greenberg's motion asserted that he and the IRS had filed a stipulation of settled issues in an unrelated Tax Court proceeding—which he attached—involving a subsequent tax year and that he thus had carryback losses from the tax years 2004 through 2008 that could be eligible for carryback to one of the tax years at issue in this case.

On May 31, 2018, the Tax Court issued its memorandum opinion upholding the adjustments underlying each of the NODs but declining to uphold the penalties assessed because the IRS had failed to timely obtain supervisory approval of those penalties.[8] In recounting the case's factual background, the Tax Court specifically found Greenberg's testimony about GG Capital's sales of the long leg of the foreign currency option spreads involving JPF III and AD Global in 1999, 2000, and 2001

---

[8] The Commissioner does not challenge the Tax Court's ruling as to those penalties.

21

to not be credible and, instead, found it more likely than not that those sales never took place, given the complete lack of documentary evidence of those sales.

Turning to the issues presented, the Tax Court first addressed whether GG Capital was a small partnership and made a valid TEFRA election in 1997. While noting that GG Capital had fewer than ten partners in 1997, of which three were individuals, the Tax Court noted that the purported election listed Solatium as a partner—describing it as a "Foreign PTNR with Beneficial Interest by David Greenberg"—and determined that Solatium held an indirect interest through Greenberg, making Greenberg a pass-through partner under I.R.C. § 6231(a)(9)–(10). Because Greenberg was a pass-thru partner, the Tax Court found that GG Capital did not meet the requirements of a "small partnership" for 1997 and was not eligible to make a TEFRA election. Additionally, the Tax Court noted that only Greenberg had signed the election and found that his handwritten statement that he signed on behalf of the other partners did not suffice, especially given Greenberg's lack of knowledge as to Solatium's principals and the fact that neither Lee nor a Solatium representative testified at trial as to such authorization. The Tax Court also rejected Greenberg's argument that the cases pertaining to the NODs for 2000 and 2001 should be dismissed because GG Capital was a TEFRA partnership. The Tax Court explained that Greenberg had checked "no" in response to the question asking if the partnership was "subject to the consolidated audit procedures of sections 6221

22

through 6223"—i.e., TEFRA—on GG Capital's returns and found Greenberg's testimony that he "misread" the instruction as asking whether the partnership was under audit to not be credible given his sophistication on tax issues. As the 1997 election was not valid, the Tax Court determined that the NODs were valid as GG Capital was a small partnership for those years, given it only had U.S. individual partners.

The Tax Court then addressed whether the 2004 NOD was timely mailed. The Tax Court rejected Greenberg's argument that because the 2004 NOD stated the last day to file a Tax Court petition was January 14, 2005, which was ninety-one days after October 15, 2004 (the date on the 2004 NOD), the 2004 NOD was actually mailed on October 16. Noting the Commissioner's burden, the Tax Court explained that the Commissioner had introduced a Form 3877 showing that the IRS mailed the 2004 NOD on October 15, 2004, from St. Louis, Missouri, with a postmark stamp from the U.S. Postal Service. The court also noted that a group manager of the examination division in St. Louis during 2004 testified credibly that an IRS employee, who was since deceased, prepared the NOD and was the "type of person that would do whatever needed to be done when it came to her work performance," e.g., by physically taking the notice to the post office. Thus, the Tax Court found it more likely than not that the 2004 NOD was timely mailed.

23

Turning to the DBI abandonment loss, the Tax Court found that Greenberg failed to prove that GG Capital owned a partnership interest in DBI. While noting Goddard's testimony that GG Capital owned an interest and had received at least one K–1, the Tax Court explained there was no documentary evidence to support that testimony. The Tax Court further found the taxpayers' testimony was not credible on the subject and thus found no entitlement to deduct an abandonment loss as to DBI.

Next, the Tax Court addressed the Son-of-BOSS tax shelters in the case. Greenberg asserted that GG Capital conducted a real business and that the option spread transactions had "economic substance" and made money. By contrast, the Commissioner argued for the disallowance of the losses because: (1) AD Global was a sham, lacked economic substance, and did not have reasonable expectation of profit; (2) AD Global should be disregarded as a partnership, as should JPF III as a partner; (3) the AD Global transaction lacked economic substance regardless of whether some option spreads made money; (4) the Commissioner properly raised economic substance in the 2009 NODs; and (5) Greenberg's experts used unreliable methods to evaluate the option spreads.

Analyzing the transactions, the Tax Court first looked to whether AD Global and JPF III were partnerships under the factors set forth by *Luna v. Commissioner*, 42 T.C. 1067 (1964). As to AD Global, the Tax Court found that JPF III and the

24

other members of AD Global did not intend to "join together" to undertake business under AD Global and thus were not partners in the purported partnership. As to JPF III, the Tax Court found that Greenberg and Goddard did not join together to form a partnership entity, noting that there was nothing showing that either contributed anything to JPF III and that they did not produce a formal operating agreement or any other document showing its business was conducted in a joint name. The Tax Court explained that JPF III only served as a conduit for option spreads and as a basis inflator and that nothing in the record showed there was any real profit to control or that either member had a formal right to withdraw. And there was no indication that JPF III kept books or records; the Tax Court found that the K–1s issued to both members were "not enough."

The Tax Court also explained that there was another hurdle to finding either entity to be a partnership, i.e., that it must conduct some kind of business activity. While Goddard testified that there was an opportunity to make money because the options seemed underpriced, the Tax Court noted a relatively minor business purpose will not validate a transaction if it is no more than a facade, which it determined was the case. The Tax Court explained that the paired options in the case were almost identical to other iterations of Son-of-BOSS deals and were unusual, as they "were only one pip apart and very far out-of-the-money" and the strike prices were so close together that they were indistinguishable from a risk-

management perspective.    As to the Lehman option spread, the Tax Court specifically found that Lehman "would never have allowed JPF III to collect on the long leg or even dispose of it separately" nor "have chosen a spot rate that fell in the 'sweet spot.'"  As to profit motive, the Tax Court noted that JPF III's entrance and exit from AD Global were necessary to generate GG Capital's artificial losses and that there was not a nontax need to form the partnerships, i.e., "the only purpose for AD Global and JPF III was to carry out a tax-avoidance scheme."  And the Tax Court found that the taxpayers never intended to run businesses under the umbrella of those entities.  As such, the Tax Court disregarded both AD Global and JPF III.

Because it disregarded AD Global and JPF III for tax purposes, the Tax Court treated those partnerships' activities as engaged in directly by the purported partners, i.e., treating everything as owned directly by Greenberg and Goddard, including the option pairs.  Additionally, the Tax Court treated the option pairs as never being contributed to AD Global or purchased by JPF III, with any gain or loss supposedly realized being attributed to Greenberg and Goddard.  And the Tax Court explained that the options should have been treated as a single-option spread, meaning that the long and short positions were part of one contract and could not be separated as a matter of fact and law.  Turning to the alleged 2000 and 2001 sales of the long legs of the option spreads from GG Capital to Greenberg, the Tax Court again found that the sales never took place, as there was no documentary evidence that the sales

26

actually occurred and it found the taxpayers' testimonies not credible. The Tax Court therefore found Greenberg not entitled to take any losses related to the long legs of the options.

The Tax Court further noted that the Commissioner acknowledged that there was some duplication of disallowances between the 2004 and 2005 NODs and the 2009 NODs that would need to be sorted out in computations. As such, the Tax Court ordered the parties to submit calculations under Tax Court Rule 155.

Greenberg moved for reconsideration of the opinion, as well as to reopen the record. The Tax Court denied both motions, as the motion for reconsideration reiterated the same arguments Greenberg had made previously and the motion to reopen involved documents that he and Goddard could have introduced at the time of trial but failed to. The Tax Court also denied as "proceeding from a lack of due diligence" Greenberg's March 30, 2015, motion in case no. 1335-06 requesting to carryback an alleged net operating loss ("NOL") from an unrelated case involving his subsequent tax years.

On July 12, 2019, the Commissioner submitted his Rule 155 computations. Following this submission, Greenberg moved to dismiss for lack of jurisdiction, arguing that the Commissioner's proposed adjustments violated TEFRA procedures because he could not include adjustments to partnership items in a nonpartnership item NOD or in an FPAA. The Tax Court denied this motion. On November 27,

2019, Greenberg submitted his computations and objected to those submitted by the Commissioner.

On April 17, 2020, the Tax Court adopted the Commissioner's computation in each of the consolidated cases. The Tax Court rejected Greenberg's objections to the computations, i.e., that the alleged NOL from later tax years should be considered in the computation, that he was entitled to a suspension of interest under I.R.C. § 6404(g), and that the computation ignored I.R.C. § 704(b) in allocating GG Capital's income. This appeal ensued.

## II.   STANDARDS OF REVIEW

We review the Tax Court's legal conclusions *de novo*. *Highpoint*, 931 F.3d at 1056. Questions of subject-matter jurisdiction and statutory interpretation are legal issues reviewed *de novo*. *Id.* Whether the Tax Court properly allocated the burden of proof is also a legal issue reviewed *de novo*. *See Brinkley v. Comm'r*, 808 F.3d 657, 663 (5th Cir. 2015).

We review the Tax Court's factual findings for clear error. *Curtis Inv. Co. v. Comm'r*, 909 F.3d 1339, 1347 (11th Cir. 2018). "A finding of fact is clearly erroneous if the record lacks substantial evidence to support it, so that our review of the entire evidence leaves us with the definite and firm conviction that a mistake has been committed." *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d 1360, 1364 (11th Cir. 2010) (quoting *Atlanta Athletic Club v. Comm'r*, 980 F.2d 1409, 1411–12 (11th Cir.

1993)).  "Under the clear error standard, 'where there are two permissible views of the evidence, the tax court's choice between them cannot be clearly erroneous.'" *Curtis Inv.*, 909 F.3d at 1347 (quoting *Piggly Wiggly S., Inc. v. Comm'r*, 803 F.2d 1572, 1576 (11th Cir. 1986)).  And "[f]actual findings based on credibility assessments are entitled to particular deference." *Id.*

The parties dispute the standard of review regarding the Tax Court's rulings on Greenberg's post-trial motions and adoption of the Commissioner's Rule 155 computation over his objections.  Greenberg urges us to consider them *de novo*, while the Commissioner contends that these rulings primarily involve the Tax Court's exercise of discretion such that the abuse of discretion standard applies.  We agree with the Commissioner.  We review for an abuse of discretion the Tax Court's decision to not consider a new issue after trial and during the Rule 155 computation proceedings.  *See Knowlton v. Comm'r*, 791 F.2d 1506, 1511 (11th Cir. 1986).  The Tax Court's decision to not reopen the record is also reviewed for an abuse of discretion.  *Estate of Byrd v. Comm'r*, 388 F.2d 223, 234–35 (5th Cir. 1967).[9]  And the Tax Court's adoption of the Commissioner's Rule 155 computation is likewise reviewed for an abuse of discretion.  *JPMorgan Chase & Co. v. Comm'r*, 530 F.3d

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit before October 1, 1981.

634, 638 (7th Cir. 2008). With these standards in mind, we turn first to the jurisdictional issues raised by Greenberg and then to the merits.

## III.  ANALYSIS

On appeal, Greenberg raises multiple issues. First, he contends that the Tax Court failed to consider its jurisdiction. Second, Greenberg challenges the Tax Court's decision to uphold the adjustments the Commissioner made in the NODs. Third, he argues that the Tax Court erroneously rejected the issues he raised after trial. We address these issues in turn.

### A.    Jurisdictional Issues

Greenberg contends that the Tax Court lacked jurisdiction over some or all of the NODs for a number of reasons. First, Greenberg argues that the Tax Court lacked jurisdiction over the 2004 and 2005 NODs because the Commissioner failed to comply with TEFRA's requirement that it issue FPAAs to GG Capital in order to propose the adjustments contained in those NODs. Second, Greenberg argues that the 2004 and 2005 NODs were untimely, although for different reasons. Finally, Greenberg argues that even if the NODs were valid, the Tax Court lacked jurisdiction over specific adjustments contained in them. We address these arguments below.

1.    Whether GG Capital's I.R.C. § 6231(a)(1)(B)(ii) election for the 1997 tax year was valid

30

Greenberg first contends that the Tax Court lacked jurisdiction over the 2004 and 2005 NODs—which relate to the 2000 and 2001 tax years—because the Commissioner was required to treat GG Capital as a TEFRA partnership and to issue it FPAAs in order to propose the adjustments contained in those NODs. Greenberg's argument rests upon the handwritten statement on GG Capital's 1997 partnership return, which Greenberg contends was a valid election under I.R.C. § 6231(a)(1)(B)(ii) to be subject to the TEFRA partnership procedures for all future tax years.

As noted above, during the relevant tax years, any partnership that was required to file a return under § 6031(a) was subject to the TEFRA partnership procedures, unless the partnership qualified as a small partnership. I.R.C. § 6231(a)(1). Under § 6231(a)(1)(B)(i), a small partnership was a "partnership having 10 or fewer partners each of whom [was] an individual (other than a non-resident alien), a C corporation, or an estate of a deceased partner." But § 6231(a)(1)(B)(ii), which was contained under the "Exception for small partnerships" subparagraph, provided that "[a] partnership (within the meaning of [§ 6231(a)(1)(A)]), may for any taxable year elect to have clause (i) not apply" and that "[s]uch election shall apply for such taxable year and all subsequent taxable years unless revoked with the consent of the Secretary."

31

As an initial matter, it is clear that, for the 1997 tax year, GG Capital was *not* a small partnership—a fact which Greenberg concedes. Although three of GG Capital's partners for the 1997 year were individuals—Greenberg, Goddard, and Lee—Solatium was not, and there is no evidence in the record showing that Solatium was a C corporation. In fact, Greenberg, on the 1997 return, described Solatium as a "Foreign PTNR with Beneficial Interest."[10] Thus, for purposes of the 1997 tax year, GG Capital was already subject to the TEFRA partnership procedures, regardless of whether it made an election under § 6231(a)(1)(B)(ii). Subsequently, after Solatium left the partnership, GG Capital met the definition of a small partnership under § 6231(a)(1)(B)(i), and was a small partnership for purposes of the 2000 and 2001 tax years. The question before us then is, what effect did GG Capital's attempted 1997 election—which was made when it was not a small partnership—have, given that it later became a small partnership for purposes of TEFRA?

Greenberg contends that the § 6231(a)(1)(B)(ii) election for TEFRA procedures to apply for all subsequent tax years could have been taken by any partnership, not just small partnerships. In other words, by making the election in

---

[10] Although we agree with the Tax Court that GG Capital was not a small partnership for the 1997 tax year, we disagree with its finding that Solatium held an "indirect interest" through Greenberg based on its reading of the statement "Foreign PTNR with Beneficial Interest *by David Greenberg*." (emphasis added). We read the "by David Greenberg" language to be Greenberg claiming he had the authority to sign on behalf of Solatium, especially given that "by David Greenberg" is written below both Goddard's and Lee's initials.

1997, GG Capital covered its bases so that TEFRA's procedures would apply to it, regardless of whether it qualified as a small or non-small partnership for any particular tax year. The Commissioner disagrees, asserting that the election could only be made by partnerships that qualify as small partnerships at the time of the election, and that GG Capital's 1997 election therefore was invalid.

We need not decide the question of whether a partnership that was already subject to the TEFRA partnership procedures, i.e., a non-small partnership, could make a § 6231(a)(1)(B)(ii) election that covers all subsequent tax years because, even assuming that GG Capital was permitted to make such an election, Greenberg's handwritten statement attached to GG Capital's 1997 return was not valid.

Former § 6231(a)(1)(B)(ii), which governed the election into TEFRA, was silent as to the manner in which a partnership could make the election. Section 6230(k), however, authorized "[t]he Secretary [to] prescribe such regulations as may be necessary to carry out the purposes of" TEFRA. Thus, the Secretary was permitted to issue regulations as to the method to make the § 6231(a)(1)(B)(ii) election and did so in Temp. Treas. Reg. § 301.6231(a)(1)-1T(b) (1997). *See E. Norman Peterson Marital Tr. v. Comm'r*, 78 F.3d 795, 798 (2d Cir. 1996) ("Until the passage of final regulations, temporary regulations are entitled to the same weight we accord to final regulations."); *see also UnionBanCal Corp. v. Comm'r*, 305 F.3d 976, 985 n.52 (9th Cir. 2002) (collecting cases); *Truck & Equip. Corp. of*

33

*Harrisonburg v. Comm'r*, 98 T.C. 141, 149 (1992). Regulation 301.6231(a)(1)-1T(b)(1) provided that "[a]ny partnership that meets the requirements set forth in section 6231(a)(1)(B) of the Code and paragraph (a) of this section (relating to the exception for small partnership) may elect under paragraph (b)(2) of this section to have the provisions of [TEFRA] apply with respect to that partnership." Regulation § 301.6231(a)(1)-1T(b)(2), in turn, provided for the "[m]ethod of election":

> A partnership shall make the election described in paragraph (b)(1) of this section by attaching a statement to the partnership return for the first taxable year for which the election is to be effective. The statement shall be identified as an election under section 6231(a)(1)(B)(ii), *shall be signed by all persons who were partners of that partnership at any time during the partnership taxable year to which the return relates*, and shall be filed at the time (determined with regard to any extension of time for filing) and place prescribed for filing the partnership return.

(emphasis added).

In the handwritten statement attached to GG Capital's 1997 return, Greenberg wrote that "[t]he Partners of [GG Capital] do hereby elect under IRC Section 6231(a)(1)(B)(ii) to be subject to the provisions of 'Tefra' as defined in the IRC." Greenberg signed his initials and wrote his name under the statement. However, Goddard, Lee, and an authorized representative of Solatium did *not* sign the statement. Instead, Greenberg wrote the initials and names of Goddard and Lee, followed by the words "by David Greenberg." And Greenberg wrote "SII"—in reference to Solatium—followed by "Solatium Investments Foreign PTNR with Beneficial Interest by David Greenberg." Greenberg then wrote that "[t]he [GG

34

Capital] partners have authorized Greenberg to sign on their behalf." Out of the other three partners, only Goddard testified that he gave Greenberg the authority to sign on his behalf.

The temporary regulation explicitly required that the statement "be signed by all persons who were partners of [the] partnership" but did not expressly foreclose one partner authorizing another partner to sign on his or her behalf. *See* Temp. Treas. Reg. § 301.6231(a)(1)-1T(b)(2). But, even assuming for the sake of argument that a partner could have authorized another partner to sign the election on his or her behalf, the Tax Court found that the election itself was not valid. Specifically, the Tax Court did not find Greenberg's testimony credible that he had received authorization from Lee and Solatium to sign the election on their behalf. Although Greenberg claims that he had "express authorization from all partners to sign the election" and takes issue with the Tax Court's determination to the contrary, our review of the Tax Court's factual findings is for clear error. *See Curtis Inv.*, 909 F.3d at 1347. And here, the Tax Court took a permissible view of the evidence, i.e., not finding Greenberg's testimony credible, such that clear error is not established. Indeed, Greenberg did not call either Lee or a Solatium representative to confirm his testimony concerning the signatory authorization nor did Greenberg introduce any written evidence that he had such authority, e.g., powers of attorney.

Greenberg also contends that the temporary regulation was contrary to the plain meaning of I.R.C. § 6231(a)(1)(B)(ii) because there is no statutory requirement that all partners of the partnership must sign the election. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1253 (11th Cir. 2006) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)), *modified on denial of reh'g*, 468 F.3d 1272 (11th Cir. 2006). We first consider whether Congress has directly spoken to the precise question at issue in the case, and, if Congress's intent is clear, we "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 483). Where a statute is silent or ambiguous with respect to the specific issue, however, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 483). Indeed, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (second alteration in original) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). Where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and "[s]uch legislative regulations are given controlling weight

36

unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. However, in cases where "the legislative delegation to an agency on a particular question is implicit rather than explicit," we may not substitute our "own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Thus, we must determine "whether the agency's answer is based on a permissible construction of the statute."[11] *Mayo Found. for Med. Educ. & Res. v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843).

Here, we find temporary regulation § 301.6231(a)(1)-1T(b) was a permissible construction of the statute. Section 6231(a)(1)(B)(ii) was silent as to the method in which a partnership must make the election. Although § 6231(a)(1)(B)(ii) itself did not specifically delegate to the Secretary the authority to prescribe regulations, § 6230(k), as noted above, authorized the Secretary to promulgate regulations necessary to carry out the purposes of TEFRA. *Cf. McKnight v. Comm'r*, 7 F.3d 447, 452 (5th Cir. 1993). We need not determine whether the authority Congress

---

[11] In *Mayo*, the Supreme Court held that the *Chevron* framework applied to Treasury Regulations regardless of whether Congress's delegation of authority to the Secretary was "general or specific," declining to apply its pre-*Chevron* cases that had held Treasury Regulations were entitled to less deference when issued under the Secretary's "general authority" to prescribe such regulations as opposed to regulations "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *See* 562 U.S. at 56–58 (quoting *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981)). As such, we apply the *Chevron* framework to the temporary regulation at issue and ask whether it was a permissible construction of § 6231(a)(1)(B)(ii).

37

conveyed to the Secretary in § 6230(k) was an explicit or implicit legislative delegation because Greenberg has not shown how temporary regulation § 301.6231(a)(1)-1T(b) was an unreasonable interpretation of the statutory election made by the Secretary, let alone demonstrated that it was arbitrary and capricious. Indeed, Greenberg's only argument on this issue is that § 6231(a)(1)(B)(ii) did not state that each partner of a partnership seeking to make the election must sign the statement. But the statute was completely silent as to the method of making the election, and § 6230(k) authorized the Secretary to promulgate regulations to carry out the purposes of TEFRA.

Moreover, nothing in the plain language of § 6231(a)(1)(B)(ii) prohibited the partner signature requirement set forth in the temporary regulation. Although the lack of technically inconsistent language between a statute and its interpretative regulation alone is not dispositive of the reasonableness question, *see United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982) (rejecting "the suggestion that a regulation is to be sustained simply because it is not 'technically inconsistent' with the statutory language, when that regulation is fundamentally at odds with the manifest congressional design" (quoting *United States v. Cartwright*, 411 U.S. 546, 557 (1973))), we find that the former temporary regulation was a permissible interpretation of § 6231(a)(1)(B)(ii) by the Secretary.

38

As the Tax Court has explained, the small partnership exception to TEFRA "sought to establish that the partnerships which would realize such exception were those whose members 'treat themselves as co-ownerships rather than partnerships, as each co-owner resolves his own tax responsibilities separately as an individual with the IRS.'" *McKnight v. Comm'r*, 99 T.C. 180, 185 (1992) (quoting *Tax Compliance Act of 1982 and Related Legislation: Hearings on H.R. 6300 Before the H. Comm. on Ways & Means*, 97th Cong., 2d Sess. 259–61 (1982)), *aff'd*, 7 F.3d 447 (5th Cir. 1993).  Thus, the temporary regulation's requirement that each partner in a small partnership sign an election to no longer resolve his or her own responsibilities separately as an individual with the IRS was reasonable to carry out the election provided in § 6231(a)(1)(B)(ii), as it ensured that each partner agreed to give up the special treatment that Congress established for small partnerships whose partners saw themselves as co-owners.  Therefore, we conclude that temporary regulation § 301.6231(a)(1)-1T(b) was a reasonable interpretation of the statute by the agency.

Additionally, Greenberg makes the conclusory assertion that, under California law, he was authorized to sign GG Capital's return on behalf of all partners to make the election as an agent of the partnership.  *See* Cal. Corp. Code § 16301(1) (stating that "[e]ach partner is an agent of the partnership for the purpose of its business").  As an initial point, we conclude that the relevant California statute does not apply

39

here.    Section 16301(1) of the California Corporate Code establishes that each partner is an agent of the partnership; pursuant to that agency authority, one partner's actions often can bind the partnership to various commitments, regardless of the other partners' knowledge or consent.  The temporary regulation, however, did not require that the partnership entity elect to be subject to TEFRA by the partnership entity, but instead required affirmative consent by each individual partner to give up the special treatment of small partnerships under TEFRA.  Absent unanimous consent from the individual partners, the small partnership entity remains exempt from TEFRA.  The issue, therefore, is not whether Greenberg could act as an agent of the partnership, but whether he could act as an agent for each partner for purposes of their individual election under TEFRA.  Because the California statute does not apply to this issue, Greenberg's reliance on it is unpersuasive.

Greenberg further claims that the temporary regulation only applied to *small partnerships*, but not a partnership already subject to TEFRA, such as GG Capital, choosing to make the § 6231(a)(1)(B)(ii) election for subsequent tax years in which that partnership may qualify as a small partnership.  We likewise find this argument without merit.  Again, assuming for the sake of argument that a non-small partnership could have made the election, it strains credulity that the Secretary and the temporary regulation conceived of two separate regimes for small partnerships

40

and non-small partnerships regarding partners signing the election to be subject to TEFRA.

And Greenberg contends that, even if the temporary regulation applied and GG Capital's election was invalid, the election still "substantially complied" with the temporary regulation. He asserts that the "primary purpose" of the election was to provide "clear notification" that it was unequivocally made. And "substantial compliance" with a regulation may be sufficient if a taxpayer's election, despite its flaws, comports with the essence or purpose of the statutory and regulatory scheme. *See, e.g.*, *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 794–96 (11th Cir. 1984); *Hewlett-Packard Co. v. Comm'r*, 67 T.C. 736, 750–54 (1977). However, even assuming that the temporary regulation allowed one partner to act as an agent of another partner to sign the election, the attempted election on GG Capital's 1997 return did not comport with the statute's and temporary regulation's purpose—i.e., that members of a small partnership that treat each other as co-owners rather than partners all agree to no longer resolve their tax responsibilities at the individual level. Indeed, the Tax Court noted that there was no testimony from either Lee or a Solatium representative (or any evidence in the record) demonstrating that Greenberg had the authority to sign on either of their behalf, and, as explained above, the Tax Court did not clearly err in finding that Greenberg's testimony on the issue was insufficient to demonstrate that authority, especially given his lack of

41

knowledge as to Solatium's principals.  Nor was there any evidence from Lee or a Solatium representative that the partners intended to treat each other as co-owners. Therefore, we reject Greenberg's substantial compliance argument.

Accordingly, GG Capital's attempted TEFRA election on its 1997 return was not valid.  Because GG Capital was a small partnership for the 2000 and 2001 tax years, as Greenberg, Goddard, and Lee were its only partners for those years, and because the 1997 election was not valid, GG Capital was required to attach a statement signed by all of its partners in order to elect into the TEFRA procedures under § 6231(a)(1)(B)(ii).  *See* Temp. Treas. Reg. § 301.6231(a)(1)-1T(b)(2). Because GG Capital did not do so for either 2000 or 2001,[12] it was not subject to the TEFRA regime, and the Commissioner thus was not required to send FPAAs to GG Capital to notify Greenberg of adjustments to partnership items.  We therefore reject Greenberg's assertion that the Tax Court lacked jurisdiction over 2004 and 2005 NODs on this basis.

### 2.    Whether the 2004 NOD was timely mailed

Greenberg next argues that the 2004 NODs, which concern the 2000 tax year, were untimely.  Greenberg contends that, although the 2004 NODs bear a letter

---

[12] Notably, when prompted by the question in GG Capital's partnership returns for 2000 and 2001—"Is this partnership subject to the consolidated audit procedures of sections 6221 through 6233?"—Greenberg checked "No" in each instance.

stamped date of October 15, 2004, they were in fact mailed on October 16, 2004—one day after the expiration of the ninety-day statute of limitations period for the 2000 tax year provided in I.R.C. § 6213(a). Greenberg bases his argument on the fact that the section of the NODs titled "Last Day to File a Petition," which notifies the recipient of the last date by which he or it may file a petition, bears a date stamp of January 14, 2005, which was ninety-one days after October 15, 2004. This argument is without merit.

As a general rule, the IRS must assess a taxpayer's taxes within three years after the taxpayer files his or her tax return. I.R.C. § 6501(a). Under I.R.C. § 6503(a), following the mailing of an NOD, as provided for in former I.R.C. § 6212(a), the running of the limitations period for assessment is suspended during the time within which the taxpayer can petition the Tax Court, during any litigation, and for sixty days thereafter. *See Shockley v. Comm'r*, 686 F.3d 1228, 1235 (11th Cir. 2012). Additionally, § 6213(a) provided, in relevant part, that "[w]ithin 90 days . . . after the notice of deficiency . . . is mailed . . . , the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency" and that "[a]ny petition filed with the Tax Court on or before the last date specified for filing such petition by the Secretary in the notice of deficiency shall be treated as timely filed."

"The IRS must prove it properly mailed a deficiency notice 'by competent and persuasive evidence.'" *Cropper v. Comm'r*, 826 F.3d 1280, 1285 (10th Cir. 2016)

43

(quoting *Welch v. United States*, 678 F.3d 1371, 1378 (Fed. Cir. 2012)). The Commissioner must "introduce evidence showing that the notice of deficiency was properly delivered to the U.S. Postal Service for mailing," such as "evidence of the Commissioner's mailing practices corroborated by direct testimony or documentary evidence." *Clough v. Comm'r*, 119 T.C. 183, 187 (2002). However, "[t]he Commissioner is not required to produce employees who personally recall each of the many notices of deficiency which are mailed annually." *Id.* "Where the existence of a notice of deficiency is not disputed, a Postal Service Form 3877, Acceptance of Registered, Insured, C.O.D. and Certified Mail, or its equivalent—a certified mail list—represents direct documentary evidence of the date and the fact of mailing." *Id.* at 187–88; *accord Cropper*, 826 F.3d at 1285; *Coleman v. Comm'r*, 94 T.C. 82, 90 (1990). "Exact compliance with certified mail list procedures raises a presumption of official regularity in favor of the Commissioner." *Clough*, 119 T.C. at 188. Although a petitioner may "rebut the presumption by affirmatively showing that respondent failed to follow his established procedures," *Coleman*, 94 T.C. at 91, "[a] failure to comply precisely with the certified mailing list procedures may not be fatal if the evidence adduced is otherwise sufficient to prove mailing," *Clough*, 119 T.C. at 188; *see also Cropper*, 826 F.3d at 1286 ("When there is no dispute over the existence of a deficiency notice but the IRS produces only a defective PS Form 3877, the IRS generally 'must come forward with evidence

44

corroborating an actual timely mailing of the notice of deficiency.'" (quoting *Welch*, 678 F.3d at 1378–79)).

Here, Greenberg filed his return for the 2000 tax year on October 15, 2001. Therefore, the IRS had until October 15, 2004, to mail a Greenberg an NOD for the 2000 tax year. As noted above, the 2004 NOD's letter is stamped "OCT 15 2004" while its last date to file a petition is stamped "JAN 14 2005." In the Commissioner's answer to Greenberg's petition regarding the 2004 NOD, he attached a Form 3877 that lacked the "Total Number of Pieces Received at Post Office," the "Name of receiving employee" under the Postmaster, and a date stamp from the U.S. Postal Service. However, the Commissioner subsequently introduced a completed Form 3877 into the record that listed the "Total Number of Pieces Received at Post Office" as "5," the signature of the receiving employee, and a date stamp from the postal service of October 15, 2014.

In reviewing the issue, the Tax Court reviewed the completed Form 3877 and noted that: (1) the form was stamped with OCT 15 2004; (2) the form stated that the IRS sent Greenberg NODs from St. Louis, Missouri; (3) the number "0012" was listed across from Greenberg's name, meaning the NOD was for the 2000 tax year; (4) the number 5 was written in boxes labeled "Total Number of Pieces Listed by Sender" and "Total Number of Pieces Received at Post Office"; (5) someone from USPS signed in the box labeled "Postmaster (Name of receiving employee)"; and

(6) the form was postmarked October 15, 2004, by a U.S. Postal Service stamp. The Tax Court also considered the testimony of Jacqueline Brooks, the group manager of the examination division in St. Louis, which prepared the 2004 NOD. The Tax Court explicitly found Brooks credible, noting that she testified that "when the statute of limitations was about to expire, as it was here, IRS employees would physically take a notice of deficiency to the post office to be mailed." As such, the Tax Court found that it was more likely than not that the 2004 NOD was mailed on time.

Reviewing the record, we conclude that the Tax Court did not err in finding the 2004 NOD was timely mailed on October 15, 2004. Although Greenberg claims that the IRS failed to follow "established procedures" for mailing, he does not point to any specific procedures that the IRS failed to follow; instead, he simply asserts that there was "chaos" surrounding the mailing of the 2004 NOD and points to Brook's testimony that the IRS did not follow "typical" procedures as to the mailing of the 2004 NOD. Reviewing Brook's testimony, however, she stated that Greenberg's case "was not a typical scenario" because the IRS "had an imminent statute [of limitations] and the statute was going that day, and in those scenarios, in this case, the former TEFRA coordinator would have been involved with those, and in those instances, we will actually physical take those notices to the Post Office." Although Brooks testified that she did not know why the 2004 NOD was issued on

46

the last possible day, she explained that "[i]t is not unusual for us to have the scenario where we might have to issue statutory notices near or on the day of the statute for a variety of different reasons." And Brooks testified that the 2004 NOD went to the Post Office on October 15, 2004, although she did not know the exact time. This testimony does not demonstrate that the IRS failed to follow its established procedures.

Greenberg also claims the "very existence of multiple versions [of the Form 3877] casts doubt on all versions," although he fails to cite to any authority in support of this argument. And, in any event, Brooks testified that the incomplete Form 3877 attached to the Commissioner's answer was a draft placed in Greenberg's administrative file and was not the version sent to the Post Office, as the IRS did not place a marked certified mail list in the administrative file. She also testified that she retrieved the completed Form 3877 with the U.S. Postal Service stamp from the IRS's files several weeks prior to trial. Accordingly, we reject Greenberg's timeliness argument as to the 2004 NOD.

3.    Whether the 2009 NOD as to the 1999 tax year was timely

Greenberg also claims that the 2009 NOD for the 1999 tax year was untimely because the "1999 AD Global statute of limitations" had expired before the Commissioner sent the May 30, 2008, conversion notice and the May 30, 2009,

47

NOD. Greenberg argues that the Tax Court erred by not making a determination on the issue.

Greenberg's argument implicates the interaction between I.R.C. § 6501(a) and former § 6229. As noted above, § 6501(a) generally requires the IRS to assess a taxpayer's taxes within three years of the filing of a tax return. In 1999, however, I.R.C. § 6229(a) provided that:

> [e]xcept as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of (1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year (determined without regard to extensions).

I.R.C. § 6229(d) further provided that:

> [i]f notice of a [FPAA] with respect to any taxable year is mailed to the [TMP], the running of the period specified in subsection (a) . . . shall be suspended . . . for the period during which an action may be brought under section 6226 (and, if a petition is filed under section 6226 with respect to such administrative adjustment, until the decision of the court becomes final).

At the time, § 6501 cross-referenced § 6229. *See* I.R.C. § 6501(n)(2) (1999).

Here, Greenberg filed his individual tax return for 1999 on October 18, 2000. The IRS sent AD Global an FPAA no later than October 14, 2003, i.e., within three years of October 18, 2000. On March 8, 2004, AD Global, through a partner other than the TMP, filed a complaint for readjustment of partnership items under I.R.C.

48

§ 6226[13] for the 1999 tax year in the United States Court of Federal Claims (the "AD Global case"). The AD Global case was pending when the parties proceeded to trial in February 2011 and, according to Greenberg, is still pending in that court.

The Commissioner asserts that, because the AD Global case remains pending, the limitations period for the assessment of AD Global items against Greenberg was open on May 30, 2008, when the Commissioner sent him a letter notifying him that his AD Global partnership items would be converted to nonpartnership items, and on May 30, 2009, when the Commissioner sent him the 2009 NOD for the 1999 tax year. In response, Greenberg contends that the limitations period under § 6501(a) has expired and, as such, the 2009 NOD for the tax year was untimely.

"[L]imitations statutes barring the collection of taxes otherwise due and unpaid are strictly construed in favor of the [g]overnment." *Bufferd v. Comm'r*, 506 U.S. 523, 527 n.6 (1993) (quoting *Badaracco v. Comm'r*, 464 U.S. 386, 392 (1984)). Our Circuit has limited case law addressing the interaction between § 6501(a) and former § 6229. In *United States v. Clarke*, 816 F.3d 1310, 1317 n.6 (11th Cir. 2016), this Court cited § 6229(d) for the proposition that "[t]he statute of limitation to assess a partnership return is suspended during the period in which the taxpayer may

---

[13] I.R.C. § 6226(a) provided that, within ninety days on which an FPAA is mailed to the TMP, the TMP may file a petition for a readjustment of the partnership items for the taxable year. Under § 6226(b), if the TMP did not file such a petition, certain partners that were not the TMP could file a readjustment petition within sixty days after the close of the ninety-day period set forth in subsection (a).

challenge the FPAA in court, or, until the court's decision becomes final, and then for one year after." We further explained that "because the IRS issued the FPAA before the limitations period expired [in *Clarke*], its ability to assess and collect from [the partnership was] extended to one year following the tax court's final decision." *Id.*

Other courts, however, have addressed the interaction between the two statutes in more detail. For example, in *BLAK Investments v. Commissioner*, 133 T.C. 431, 435–36 (2009), the Tax Court explained that, where a tax is imposed on partnership items, § 6229 set "forth special rules to extend the period of limitations prescribed by section 6501 with respect to partnership items or affected items" and "supplements section 6501." The Tax Court further explained that § 6229 was "not a separate statute of limitations for assessments attributable to partnership items." *Id.* at 436. Indeed, the Tax Court has described § 6501(a) as providing the "*maximum* period for the assessment of any tax" and § 6229 as having provided the "*minimum* period of time for the assessment of any tax attributable to partnership items . . . notwithstanding the period provided for in section 6501." *See Rhone-Poulenc Surfactants & Specialties, L.P. v. Comm'r*, 114 T.C. 533, 542 (2000).

Thus, as explained by the Tax Court, under § 6229(d), the mailing of an FPAA suspended the running of both the § 6501(a) period and the § 6229(a) period, and "[t]he suspension [was] for the period during which an action for judicial review of

50

the FPAA may be brought (and, if an action is brought, until the decision of the court has become final) and for 1 year thereafter." *BLAK Invs.*, 133 T.C. at 436. In other words, only when "partnership-level proceedings are commenced after the time for assessing tax against the partners has expired, the proceedings will be of no avail because the expiration of the period for assessing tax against the partners, if properly raised, will bar any assessments attributable to partnership items." *Id.* (quoting *Rhone-Poulenc*, 133 T.C. at 534–35). And, "[i]n situations where sections 6501(a) and 6229(a) both apply, [the Tax] Court has held that the longer of the two periods controls." *Tr. u/w/o Namm v. Comm'r*, T.C. Memo. 2018-182 (collecting cases).

Several other circuits have reached the same conclusion. In *AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States*, 481 F.3d 1351, 1354 (Fed. Cir. 2007), the Federal Circuit, reading the two sections together, concluded that "§ 6229(a) unambiguously set[] forth a minimum period for assessments of partnership items that may extend the regular statute of limitations in § 6501." It explained that, while § 6501(a) set forth a mandatory maximum period in which tax assessments must be made, § 6229(a)'s language did not create an independent statute of limitations because it did not set forth a maximum period. *See id.* In *Curr-Spec Partners, L.P. v. Commissioner*, 579 F.3d 391 (5th Cir. 2009), the Fifth Circuit agreed with the interpretations of the Tax Court and Federal Circuit and adopted their analyses. *See id.* at 397–38 (relying on *Rhone-Poulenc* and *AD Global*). And,

51

in *Mathia v. Commissioner*, 669 F.3d 1080, 1086 (10th Cir. 2012), the Tenth Circuit noted the default three-year limitations period in § 6501(a) but explained that, "if a taxpayer challenges an FPAA, I.R.C. § 6229(d) suspend[ed] the default limitations period, allowing the IRS to make assessments until one year after the date the decision in the Tax Court proceeding [became] final."

We agree with the Tax Court's and our sister circuits' interpretations.  Here, the Commissioner sent AD Global an FPAA within three years of Greenberg filing his 1999 tax return, thereby suspending the limitations period.  An AD Global partner other than its TMP subsequently filed a readjustment petition in the Court of Federal Claims, and it is undisputed that the AD Global case was pending when the Commissioner converted the partnership items on May 30, 2008, and then sent Greenberg the 2009 NOD for the 1999 tax year on May 30, 2009.  *See* I.R.C. § 6229(f)(1) ("If before the expiration of the period otherwise provided in [§ 6229(a)] . . . , such items become nonpartnership items by reason of 1 or more of the events described in [§ 6231(b)], the period for assessing any [income tax] which is attributable to such items shall not expire before the date which is 1 year after the date on which the items become nonpartnership items."); *id.* § 6231(b)(1)(D) (explaining that a partnership item shall become a nonpartnership item as of the date a change occurs under § 6231(c), which includes a partner under criminal investigation); *see also* Temp. Treas. Reg. § 301.6231(c)-5T ("[P]artnership items

52

of such a partner arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner to which the criminal investigation relates shall be treated as nonpartnership items as of the date on which the partner is notified that he or she is the subject of a criminal investigation and receives written notification from the Service that his or her partnership items shall be treated as nonpartnership items.").

Thus, because the limitations period for making assessments against Greenberg related to the converted items was suspended by virtue of the pendency of the AD Global case, the 2009 NOD was timely as to the 1999 tax year.

> 4. Whether the Tax Court lacked jurisdiction over specific adjustments in the NODs

Additionally, Greenberg contends that, even if the NODs in this case overall were valid, the Tax Court lacked jurisdiction over specific adjustments in the NODs. He claims that DBI was a partnership subject to TEFRA and that the abandonment loss GG Capital took as to DBI could not be adjusted in the 2004 NOD. Similarly, he asserts that the 2005 NOD erroneously included TEFRA partnership items in its adjustments.

As to DBI, GG Capital, on its 2000 partnership return, claimed a carryover loss from its earlier abandonment of its partnership interest in DBI.[14]  In addressing

---

[14] While the DBI loss is separately stated on GG Capital's 2000 return, it is not separately stated on GG Capital's federal return, which simply claims a § 988 loss.  Greenberg asserts that

53

the DBI abandonment loss, the Tax Court noted that a taxpayer has the burden to prove entitlement to any claimed deduction and found that Greenberg failed to prove that GG Capital owned a partnership interest in DBI. While noting Goddard's testimony that GG Capital owned an interest in DBI and that it had received at least one K–1 related to DBI, the Tax Court explained that there was no documentary evidence to support the claim. The Tax Court further found that Greenberg had failed to substantiate the claim that GG Capital intended to abandon any interest it owned in DBI, i.e., a trail of documents evidencing that GG Capital took affirmative steps to abandon the interest. And the Tax Court specifically found Greenberg's and Goddard's testimonies as to the DBI loss not credible.

Following the Tax Court's opinion and the Commissioner's submission of proposed Rule 155 computations, Greenberg filed a motion to dismiss, arguing that the Tax Court lacked jurisdiction over the DBI abandonment loss because it was a partnership item for which no FPAA was issued. The Tax Court denied this motion, explaining that "there was no proof of such abandonment and that GG Capital wasn't a TEFRA partnership" and that it "was the losses that [it] had to determine, not the abandonment," meaning it had deficiency jurisdiction to do so.

---

the DBI abandonment loss was claimed on the federal return, which the Commissioner submits is likely included in the § 988 loss. Therefore, we treat the DBI abandonment loss as being reported on the federal return.

Greenberg asserts that, because GG Capital was a partner of DBI, DBI was a TEFRA partnership under I.R.C. § 6231(a)(1). He further contends that because the abandonment of a partnership interest by one partner affects the share of partnership items for the remaining partners, the validity and effect of GG Capital's DBI abandonment loss must be determined in a partnership proceeding and can only be adjusted in an FPAA. We disagree.

As an initial matter, we note that, under Tax Court Rule 155(c), any argument challenging proposed computations is "confined strictly to consideration of the correct computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court, and no argument will be heard upon or consideration given to the issues or matters disposed of by the Court's findings and conclusions or to any new issues." Indeed, "[t]he Rule 155 computation process is not intended to be one by which a party may . . . raise for the first time issues which had not previously been addressed." *Vento v. Comm'r*, 152 T.C. 1, 8 (2019) (quoting *Molasky v. Comm'r*, 91 T.C. 683, 685 (1988), *aff'd*, 897 F.2d 334 (8th Cir. 1990)). Here, Greenberg waited until after the Commissioner submitted his Rule 155 computations to argue that the Tax Court lacked jurisdiction over the DBI abandonment loss on the basis that it had not initiated a TEFRA partnership proceeding involving DBI via FPAA. Although this matter appears to be a "new issue" that was inappropriate for Greenberg to raise during the Rule 155

55

proceedings, the Tax Court did not reject Greenberg's argument on that basis, so we similarly address its merits.

"[D]eductions are a matter of legislative grace, and the taxpayer has the burden of proving his entitlement to any claimed deduction." *Tucker v. Comm'r*, 841 F.3d 1241, 1249 (11th Cir. 2016); *accord* Tax Ct. R. 142(a).  I.R.C. § 165(a) generally allows a deduction for a loss sustained during the taxable year.  To claim a deduction for an abandonment loss, the taxpayer must show that it (1) owned the property, (2) intended to abandon the property, and (3) took an affirmative act evidencing its intent to abandon the property.  *See Tucker*, 841 F.3d at 1249–50; *Citron v. Comm'r*, 97 T.C. 200, 208–09 (1991).  "Determinations regarding the existence and timing of an abandonment are issues of fact." *Tucker*, 841 F.3d at 1250.

Greenberg has failed to show how the Tax Court clearly erred in determining, as a factual matter, that GG Capital did not even own a partnership interest in DBI. Indeed, as the Tax Court noted, there is no documentary evidence in the record showing that GG Capital owned an interest in DBI.  Moreover, the Tax Court found that Greenberg's and Goddard's testimonies concerning DBI were not credible, and we give the Tax Court's credibility determinations as to factual findings particular deference under clear error review.  *See Curtis Inv.*, 909 F.3d at 1347.

In his reply brief, however, Greenberg raises for the first time the Tax Court's decision in *Blonien v. Commissioner*, 118 T.C. 541 (2002), to argue that even the determination of whether a taxpayer is a partner of a partnership must be determined in a partnership proceeding and that the Commissioner was thus required to send an FPAA. However, this Court does not address arguments advanced by an appellant first raised in his reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (collecting cases). Accordingly, we reject this argument.

Regarding the 2005 NOD, Greenberg contends that the Tax Court lacked jurisdiction over two items—a loss from JPF V and a "prior suspended loss." We find these arguments without merit. As to JPF V, Greenberg contends that, like DBI, JPF V was a TEFRA partnership. However, as the Tax Court explained in its opinion, Greenberg did not introduce any evidence as to JPF V during trial. In other words, there is nothing in the record demonstrating that JPF V existed or was a partnership, or demonstrating that, even if JPF V was a TEFRA partnership, GG Capital owned a partnership interest in JPF V. And statements by counsel in their briefs are not evidence. *See SEC v. Quiros*, 966 F.3d 1195, 1201 (11th Cir. 2020).

As to the prior suspended loss, Greenberg claims that, based on the Commissioner's "characterization," the prior suspended loss was attributable to AD Global converted items and that because the conversion of items did not occur until 2008, the Tax Court lacked jurisdiction over the prior suspended loss item in the

57

2005 NOD.  Greenberg, however, does not cite to anything in the record to support this argument and fails to explain what this "characterization" was or provide any relevant supporting arguments and authority.  "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."  *Sapuppo*, 739 F.3d at 681; *see Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) (concluding that "an appellant's brief must include an argument containing appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," and that "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal").  We thus find this argument abandoned.[15]

## B.    Whether the Tax Court properly upheld the Commissioner's adjustments to the NODs

Next, Greenberg raises several arguments challenging the Commissioner's adjustments in the 2004, 2005, and 2009 NODs, claiming that the adjustments were not valid and that the Tax Court erred in upholding them.  First, specifically as to the 2009 NODs, Greenberg contends that the Commissioner failed to make a

---

[15] To the extent that Greenberg is challenging the duplicative adjustments made between the 2005 NOD and the 2009 NODs, as explained below, the IRS is permitted to make duplicative adjustments to prevent being "whipsawed."  *See Preston v. Comm'r*, 209 F.3d 1281, 1286 (11th Cir. 2000).

"thoughtful and considered determination" as to the adjustments assessed therein before issuing the NODs. Second, as to all of the NODs, Greenberg asserts that the Tax Court failed to impose the burden of proof on the Commissioner, as required by Tax Rule 142, because the Commissioner introduced "new matters" at trial. We find neither of these arguments persuasive and discuss each in turn.

> 1. Whether the Commissioner made actual determinations as to the adjustments assessed in the 2009 NODs

As to the 2009 NODs, Greenberg contends that the Commissioner failed to examine his tax returns to see if he actually claimed the AD Global losses that were disallowed and that, as such, the Commissioner failed to make "determinations" for the tax years at issue. In support of his argument, Greenberg relies on *Scar v. Commissioner*, 814 F.2d 1363 (9th Cir. 1987), and *Kong v. Commissioner*, T.C. Memo. 1990-480.

In *Scar*, the taxpayers filed a joint return, which claimed business deductions in connection with a "videotape tax shelter." 814 F.2d at 1364. The IRS sent the taxpayers a letter (Form 892), which listed their names and addresses, the taxable year at issue, and specified a deficiency amount. *Id.* The letter stated that it was an NOD and that the taxpayers had ninety days to file a petition challenging the notice. *Id.* at 1364–65. Attached to the letter was a Form 5278 and Statement Schedule 2, which showed an adjustment to income related to a Nevada partnership and stated that the original return was "unavailable" and that the assessment would be corrected

59

once the IRS received the original return. *Id.* at 1365. The taxpayers petitioned the Tax Court, asserting they had never been associated with that Nevada partnership. *Id.* Although the IRS conceded that the NOD was incorrect because it overstated the amount of disallowed deductions and wrongly connected them with that partnership, it maintained that the NOD was valid because it was meant to disallow deductions for another company and because the IRS had made similar objections to the taxpayers' return for the previous year. *See id.* The taxpayers moved for summary judgment, which the Tax Court, sitting *en banc*, denied. *Id.* at 1366. The Tax Court ultimately entered a decision, pursuant to a stipulation, against the taxpayers, who then appealed to the Ninth Circuit. *Id.* On appeal, the taxpayers argued that the determination notice was invalid because the deficiency notice mailed to them "contained an explanation of a tax shelter completely unrelated to their return, contained no adjustments to tax based on their return as filed, and stated affirmatively that [their] return [was] 'unavailable at this time.'" *Id.*

The Ninth Circuit first noted that § 6212(a) "authorize[d] the Commissioner to send a notice of deficiency only if he first 'determines that there is a deficiency.'" *Id.* The court noted that no particular form was required for an NOD to be valid and that the Commissioner was not required to explain how the deficiencies were determined. *Id.* at 1367. Nonetheless, the Ninth Circuit explained that the NOD must "meet certain substantial requirements," i.e., "at minimum indicate that the IRS

has determined the amount of the deficiency." *Id.* (first quoting *Abrams v. Comm'r*, 787 F.2d 939, 941 (4th Cir. 1986), then quoting *Benzvi v. Comm'r*, 787 F.2d 1541, 1542 (11th Cir. 1986)). The Ninth Circuit thus posed the question as "whether a form letter that asserts that a deficiency has been determined, which letter and its attachments make it *patently obvious* that no determination has in fact been made, satisfies the statutory mandate." *Id.* (emphasis added). While agreeing that "courts should avoid oversight of the Commissioner's internal operations and the adequacy of procedures employed" when reviewing NODs, the Ninth Circuit determined that it need not look behind the NOD sent to the taxpayers to determine its invalidity, as the NOD acknowledged that the deficiency was "not based on a determination of deficiency of tax reported on the taxpayers' return" and referred "to a tax shelter the Commissioner concede[d] has no connection to the taxpayers or their return." *Id.* at 1368. Noting that the term "deficiency," as defined in I.R.C. § 6211, was defined as the amount by which tax due exceeds "the amount shown as the tax by the taxpayer upon his return," the Ninth Circuit concluded that "the Commissioner must consider information that relates to a particular taxpayer before it can be said that the Commissioner has 'determined' a 'deficiency' in respect to that taxpayer." *Id.* (quoting I.R.C. § 6211(a)). In other words, § 6212(a) required the Commissioner "to determine that a deficiency exists before issuing a notice of deficiency," and

because the NOD issued to the taxpayers revealed on its face that no determination was made, it failed to meet § 6212(a)'s requirements.  *Id.* at 1370.

Subsequently, in *Kong*, the Tax Court, relying on *Scar*, held that an NOD issued by the Commissioner was invalid.  T.C. Memo. 1990-480, at *4.  The Tax Court found that the NOD "reveal[ed] on its face that it was issued without the benefit of petitioner's income tax return" because the tax was computed at the maximum tax rate and because the NOD stated that the taxpayer's original return was "unavailable at this time."  *Id.* at *1, *3.  The Tax Court reached this conclusion even though the IRS reviewed the return of a partnership in which the taxpayer was a partner and the return's attached K–1 for that taxpayer.  *Id.* at *2.  The Tax Court explained that the Commissioner presumed that the taxpayer had taken a deduction with regard to the partnership and assumed the maximum tax rate, "which procedure the Ninth Circuit has found to be contrary to section 6212."  *Id.* at *4.  And, while recognizing that "where the notice of deficiency reveals on its face that the Commissioner failed to make a determination, [the Commissioner] is entitled to prove that he did in fact make a determination," the Tax Court found that the Commissioner had failed to do so.  *Id.* at *3–4.  Although the Commissioner argued that he reviewed the taxpayer's transcript of account, the Tax Court noted that the IRS computed an approximate figure from the transcript for the deficiency, which was more than $100,000 less than the deficiency actually assessed.  *See id.* at *4.

62

A key case underlying these decisions and cited to in *Scar* is this Court's decision in *Benzvi*, in which we addressed whether a pre-filing notification ("PFN") was a "deficiency determination and notice sufficient to trigger" the Tax Court's jurisdiction under §§ 6212(a) and 6213(a). 787 F.2d at 1541. This Court found that the PFN, which set forth the tax year and questioned deduction, was not an NOD because the IRS had not determined the actual amount of the deficiency in the PFN and had indicated that "the IRS ha[d] not yet reviewed the taxpayers' returns." *See id.* at 1543. In resolving the issue, this Court explained that "[a]lthough there is no prescribed form for a deficiency notice, the notice must at a minimum indicate that the IRS has determined that a deficiency exists for a particular year and specify the amount of the deficiency." *Id.* at 1542.

In *Stoecklin v. Commissioner*, 865 F.2d 1221, 1224 (11th Cir. 1989), this Court relied on *Benzvi* in rejecting a taxpayer's argument that the IRS failed to determine his deficiency before issuing the NOD. This Court found that the NOD met the requirements of *Benzvi*, as the NOD "computed and explained the additional taxes." *Id.* This Court also rejected the taxpayer's reliance on *Scar*, noting that, in *Scar*, the IRS had inserted an amount unrelated to any deficiency for which the taxpayers were responsible and did not have a tax return for the year at issue. *See id.* And, in *Bokum v. Commissioner*, 992 F.2d 1136, 1139 (11th Cir. 1993), we rejected the taxpayers' reliance on *Scar* where the NOD "plainly indicated that the

63

IRS was disallowing a certain deduction on the [taxpayers'] 1971 tax return, identified the source of the deduction, and recomputed the tax liability using the taxpayers' tax rate," i.e., "[t]he notice unquestionably met the minimum requirements."

Greenberg contends that, under *Scar*, the Commissioner must make a "thoughtful and considered determination" by examining the taxpayer's tax return to see if disallowed deductions were actually claimed in order for an NOD to be valid, which he asserts the Commissioner failed to do for several reasons. He first claims that it is clear from the face of the 2009 NODs that they disallow losses that were never claimed because Greenberg never claimed any AD Global losses through JPF III or another entity (or any loss in general). He further contends that the 2009 NODs do not disallow AD Global losses because they do not match the AD Global losses in a workpaper prepared by an IRS technical advisor. Additionally, he argues that because the 2009 NODs do not reference GG Capital (or purport to disallow GG Capital losses), the losses claimed by GG Capital are not relevant to the validity of the 2009 NODs. And, even if the 2009 NODs could be interpreted as referring to GG Capital, Greenberg asserts that GG Capital did not report any losses from AD Global, as GG Capital's losses came from the alleged sales of the long options to him and Goddard.

64

Each of the 2009 NODs states that the Commissioner has "determined that you owe additional tax or other amounts, or both, for the tax year(s) identified above"; the years identified on the three 2009 NODs were 1999, 2000 and 2001. Additionally, each of the 2009 NODs provides an "Explanation of Items." For example, the 2009 NOD for the 1999 tax year stated the deficiency increase in tax to be $1,255,544 and explained that Greenberg's partnership items would be treated as nonpartnership items pursuant to I.R.C. § 6231(c) and Treas. Reg. § 301.6231(c)-5T. The NOD stated that there was an ongoing partnership proceeding as to AD Global—based on the FPAA issued to AD Global in October 2003—and that "[t]he following partnership item determinations are established in regards to your *individual income tax return* as an indirect partner through JPF III, LLC, that is a disregarded entity for income tax purposes." (emphasis added). The NOD explains that the Commissioner determined AD Global was "a sham, lacked economic substance or . . . was formed or availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially" its partners' tax liabilities inconsistent with the partnership tax provisions of the Internal Revenue Code. Indeed, as explained above, JPF III, whose partners were Greenberg and Goddard, engaged in SOS transactions involving foreign currency options while it was a partner of AD Global.

The 2009 NOD for the 1999 tax year then explains that, consequently, "all transactions engaged in by AD Global . . . are treated as engaged in directly by its purported partners," including the foreign currency options. It further explained that the foreign currency options contributed to AD Global were treated as never having been contributed, with any gains or losses realized being treated as realized by the partners. Because AD Global was disregarded for income tax purposes, the NOD states that "all contributions, distributions, and any other transactions you purportedly engaged in with AD Global . . . are disregarded for Federal income tax purposes," e.g., reducing the basis of Greenberg's interest in AD Global. Additionally, the NOD provides that "the $3,005,272 reported as a loss from AD Global . . . is reduced to $0" due to all the transactions that Greenberg engaged in with AD Global being disregarded.

The 2009 NODs for the 2000 and 2001 tax years provide the same information, albeit with different numbers—an increase of $3,681,581 for 2000 and an increase of $241,511 for 2001.

Reviewing the 2009 NODs and Greenberg's and GG Capital's tax returns for the relevant tax years, we conclude that none of the 2009 NODs are invalid under *Benzvi* or *Scar*. Unlike *Scar* and *Benzvi*, the Commissioner was in possession of Greenberg's tax returns before he issued Greenberg the 2009 NODs. And, like *Stoecklin* and *Bokum*, the Commissioner here plainly computed and explained the

66

disallowances and adjustments in the 2009 NODs, and the adjustments were not unrelated to any deficiency for which Greenberg was responsible. *See Stoecklin*, 865 F.2d at 1224; *Bokum*, 992 F.2d at 1139. Indeed, an NOD "is sufficient if it demonstrates that 'the IRS has determined that a deficiency exists for a particular year and specif[ies] the amount of the deficiency." *Bokum*, 992 F.2d at 1139 (alteration in original) (quoting *Stoecklin*, 865 F.2d at 1224). We decline to look behind the 2009 NODs in assessing their validity. Accordingly, we reject this argument.

2.    Whether the Tax Court failed to impose the proper burden of proof

Greenberg also contends that the Tax Court erred in failing to impose the burden of proof on the Commissioner. We disagree.

Tax Court Rule 142(a)(1) provides that "[t]he burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the [Commissioner]." Generally, "[t]he Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving otherwise." *Tucker*, 841 F.3d at 1249. And the taxpayer has the burden of proving his entitlement to claimed deductions. *Id.* Therefore, a taxpayer "must 'clearly establish' his entitlement to a particular deduction." *Long v. Comm'r*, 772 F.3d 670, 678 (11th Cir. 2014) (quoting *Anselmo*

67

*v. Comm'r*, 757 F.2d 1208, 1211 n.2 (11th Cir. 1985)).  And, as this Court has explained, "[i]n deduction cases, there is no burden shifting.  Instead, the taxpayer retains the burden of proving the amount of his deduction '[a]t all times.'" *Palmer Ranch Holdings Ltd. v. Comm'r*, 812 F.3d 982, 1002 (11th Cir. 2016) (second alteration in original) (quoting *Gatlin v. Comm'r*, 754 F.2d 921, 923–24 (11th Cir. 1985)) (contrasting deduction cases with excise tax cases); *see also INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (explaining that "deductions are strictly construed and allowed only 'as there is a clear provision thereof'" (quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934))).  This Court has further explained that, in deduction cases, "the tax court is not bound to accept the taxpayer's valuation in full merely because the IRS's valuation is unsatisfactory: The tax court may determine its own valuation based on the whole of the evidentiary record." *Palmer Ranch*, 812 F.3d at 1002.

We note that there is a difference between "new matters" under Rule 142 and "new theories."  "[A] 'new matter' is one that reasonably would alter the evidence presented," while "[a] 'new theory' is just a new argument about the existing evidence and is thus allowed." *Hurst v. Comm'r*, 124 T.C. 16, 30 (2005); *accord Shea v. Comm'r*, 112 T.C. 183, 191 (1999) ("A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. . . .  A new theory

which merely clarifies or develops the original determination is not a new matter in respect of which [the Commissioner] bears the burden of proof." (alteration in original) (quoting *Wayne Bolt & Nut Co. v. Comm'r*, 93 T.C. 500, 507 (1989))); *Stewart v. Comm'r*, 714 F.2d 977, 990 (9th Cir. 1983) ("It is well settled that the assertion of a new theory that merely clarifies the original determination, without requiring the presentation of different evidence, does not shift the burden of proof.").

Greenberg claims that there are several "new matters" that should have resulted in the burden of proof shifting to the Commissioner under Rule 142. First, Greenberg contends that, in all of the NODs, the Commissioner did not identify losses actually claimed and make adjustments to those items and, instead, "simply recomputed what [he] wanted [Greenberg's] income to be and provided boilerplate explanations that had little or nothing to do with amounts actually reported on GG Capital's returns." But Greenberg has failed to adequately brief this argument, as he fails to provide any supporting arguments, authority, or citations to record. *See Sapuppo*, 739 F.3d at 681–82. Additionally, to the extent that Greenberg argues that the burden of proof shifted to the Commissioner because the Commissioner did not give deference to how Greenberg, GG Capital, and JPF III reported tax items in furtherance of the tax evasion scheme at issue in this case and instead disallowed losses and disregarded entities for tax purposes, we reject this argument as wholly without merit. Indeed, from the beginning, the Commissioner has sought to disallow

69

the SOS type of Son-of-BOSS transactions at issue in this case involving the artificial losses manufactured by the foreign currency options and their alleged sales.

Greenberg next claims that none of the NODs suggested that the Commissioner's position was that the long leg and short leg of the currency options were in fact a single option and that this was a "surprise issue." Relatedly, he challenges the Tax Court's exclusion of testimony from Deutsche Bank in "other proceedings" that would have contradicted this position. Both claims are without merit.

Here, the Tax Court, after disregarding AD Global and JPF III as partnerships for tax purposes, treated everything as being owned directly by Greenberg and Goddard, including the currency option pairs in the case, and treated the option pairs as never having been contributed to AD Global or purchased by JPF III. Then, in reviewing the currency options, the court explained that the options' long and short legs should have been treated as a single option spread, meaning that they could not be separated as a matter of fact and law. As such, the Tax Court disallowed the losses related to those option spreads.

We find that, at most, the Commissioner's position was a "new theory," i.e., a new argument based on existing evidence that helped clarify the original deficiency determination as to why the artificial losses created should be disallowed. All of the determinations made in the NODs in this case were in reference to the currency

options and disallowed losses related to those options. And Greenberg fails to identify any new evidence that was introduced following the issuance of the NODs as to this issue. Thus, this is not a "new matter" under Rule 142, and the Tax Court did not apply the incorrect burden of proof on this issue. Rather, as the Commissioner explains, Greenberg was required to prove his entitlement to this loss deduction by showing that the currency options could be profitable and were not merely for tax avoidance.

Greenberg further contends that he was not placed on notice that JPF III's validity as a partnership was at issue in the case, making it a "new issue." We disagree. As the Tax Court explained, for this type of Son-of-BOSS transaction to work, AD Global and JPF III were required to be valid partnerships, as the partnership-basis rules were the only way to achieve the goal of inflating the bases in the option spreads. Thus, because Greenberg had the burden of proving his claimed loss deductions, he was required to prove that JPF III was a valid partnership.

Finally, Greenberg challenges the Tax Court's denial of his motion to reopen the record, asserting that he should have been allowed to introduce documents in support of the transactions that the Tax Court found did not happen. We review the Tax Court's decision on a motion to reopen the record for an abuse of discretion. *See Estate of Byrd*, 388 F.2d at 234–35. The Tax Court denied the motion to reopen

71

the record because the documents that Greenberg sought to introduce were all available at the time of trial. And Greenberg offers no explanation on appeal as to why he did not introduce these documents before or during trial other than his mistaken assumption that his and Goddard's testimonies would be sufficient to meet his burden in proving entitlement to the loss deductions that were disallowed. Greenberg failed to introduce those documents into evidence at trial, and we conclude that the Tax Court did not abuse its discretion in denying the motion to reopen the record to allow him to introduce new evidence so late into the action.

**C.     Whether the Tax Court erred in its post-trial rulings**

Greenberg further contends that the Tax Court erred in rejecting the multiple issues he raised following trial: (1) by accepting the Commissioner's Rule 155 computations; (2) by refusing to consider the California Uniform Partnership Act's ("CUPA") and I.R.C. § 704(b)'s effect on allocations conceded by the Commissioner before trial; (3) by refusing to consider I.R.C. § 6404(g) interest suspension conceded by the Commissioner in the NODs; and (4) by refusing to consider his NOL after it was determined by the Commissioner in a separate, unrelated case. None of these arguments have any merit and are each addressed in turn.

1.     Duplicative Adjustments and Anti-whipsaw

As to the adoption of the Commissioner's Rule 155 computations, Rule 155(b) provides that "[i]f the parties are not in agreement as to the amount to be included in the decision in accordance with the findings and conclusions of the Court, then each party shall file with the Court a computation of the amount believed by such party to be in accordance with the Court's findings and conclusions." We review the Tax Court's adoption of a party's Rule 155 computations for abuse of discretion. *JPMorgan*, 530 F.3d at 638.

Greenberg first argues that the Tax Court should not have adopted the Commissioner's computations, claiming that there were "duplicative adjustments" between the 2004 and 2005 NODs and the 2009 NODs for the 2000 and 2001 tax years. He asserts that the Commissioner waited until the Rule 155 proceedings to make an "actual" determination of the adjustments in this case. In essence, this argument is similar to Greenberg's other jurisdiction-related arguments we rejected above, and we likewise reject it here.

It is well established that the IRS "is permitted to assert inconsistent positions against taxpayers on different sides of a transaction to protect the treasury against 'whipsaw' by taxpayers who themselves assert inconsistent positions." *Preston v. Comm'r*, 209 F.3d 1281, 1286 (11th Cir. 2000); *accord Clapp v. Comm'r*, 875 F.2d 1396, 1401 (9th Cir. 1989); *Gerardo v. Comm'r*, 552 F.2d 549, 555 (3d Cir. 1977). Indeed, "[a]ny other approach would reward the tax evader who could come up with

73

a novel scheme and force the Commissioner to take a single, consistent legal interpretation," and "[i]f the courts later ruled the scheme illegal, but took a different interpretation than the Commissioner, the taxpayer would successfully evade taxes." *Clapp*, 875 F.2d at 1401; *accord Gerardo*, 552 F.2d at 555 ("The [anti-whipsaw] practice is grounded in the Commissioner's need to protect the revenue and avoid a windfall for a delinquent taxpayer.").

Thus, the Commissioner was permitted to make duplicative adjustments between the 2004 and 2005 NODs and the 2009 NODs for the 2000 and 2001 tax years in order to prevent being whipsawed. The fact that, during the Rule 155 computations, the Commissioner—as ordered by the Tax Court—eliminated duplicative adjustments and that the 2009 NOD for the 2001 tax year resulted in no proposed adjustment following the computations does not establish that the Tax Court lacked jurisdiction over all the NODs or abused its discretion in adopting the Commissioner's computations.

## 2.    The California Uniform Partnership Act and I.R.C. § 704

Next, Greenberg contends that the Commissioner, under I.R.C. § 704, was required to apply the CUPA and allocate GG Capital's partnership items pro rata among GG Capital's partners but failed to do so.

Generally, a partner's distributive share of a partnership's tax items is determined by the partnership agreement. I.R.C. § 704(a). However, under I.R.C.

74

§ 704(b), where a partnership agreement does not provide for the partner's distributive share of the partnership's tax items, the "partner's distributive share . . . shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances.)."   Regulation § 1.704-1(b)(1)(i), the relevant regulation, provides that, when a partnership agreement does not provide for allocation of partnership items to a partner or does so in a way that the allocations lack substantial economic effect, the partner's distributive share shall be determined in accordance with the partner's interest in the partnership, "taking into account all facts and circumstances."  Here, it is undisputed that GG Capital lacked a written partnership agreement.[16]

Greenberg asserts that the Commissioner acknowledged he would apply § 704(b) in allocating adjustments among GG Capital's partners in his pretrial memorandum.  Greenberg, however, claims that the "regulations under § 704(b) base allocations on the partnership's applicable state law"; he later identifies the regulation as § 1.704-1(b)(2)(ii)(h) in his reply brief.  He contends that because GG Capital is a California partnership, the CUPA applies, which requires pro rata

---

[16] For the first time in his reply brief, Greenberg contends that GG Capital had an "oral" partnership agreements that was "supplemented by CUPA," that GG Capital had a partnership agreement pursuant to § 704(a), and that, because § 704(a) applies, the "facts and circumstances" test in § 1.704-1(b)(1)(i) does not apply.  This Court, however, "repeatedly has refused to consider issues raised for the first time in an appellant's reply brief," *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004), and we likewise decline to consider this argument here.  Greenberg could have raised this argument to the Tax Court before or during trial, but he failed to do so.

allocations of a partnership's items among its partners unless a partnership agreement provides otherwise. *See* Cal. Corp. Code §§ 16103, 16401. In his reply brief, Greenberg points to regulation § 1.701-1(b)(2)(ii)(h)'s definition of the term "partnership agreement," which he asserts includes all agreements among partners "whether oral and written" and provisions of state or law that govern the affairs of the partnership. We reject this argument.

Greenberg waited until his objections to the Commissioner's Rule 155 computations to raise this allocation issue. In adopting the Commissioner's computations, the Tax Court declined to consider the issue as Greenberg failed to raise this "factbound question during litigation." As we have previously noted, "[t]he Rule 155 computation process is not intended to be one by which a party may . . . raise for the first time issues which had not previously been addressed." *Vento*, 152 T.C. at 8 (second alteration in original) (quoting *Molasky*, 91 T.C. at 685). "A new issue generally will be an issue other than a 'purely mathematically generated computational item[]' of this sort." *Id.* (alteration in original) (quoting *Home Grp., Inc. v. Comm'r*, 91 T.C. 265, 269 (1988)). And "[a] matter may be deemed a 'new issue' in the Rule 155 context even if it has computational aspects." *Id.* at 9. We review the Tax Court's decision to not consider a new issue at the Rule 155 stage for abuse of discretion. *Knowlton*, 791 F.2d at 1511.

76

Greenberg does not dispute that he waited until the Rule 155 computations to raise this issue. Instead, he claims that the Tax Court "faulted" him for "failing to anticipate" the Commissioner's "change of position and create a trial record on an issue [he] did not even know was at issue." However, the Commissioner, in his pretrial memorandum, did not state that he would apply the CUPA in making his allocations. Rather, he stated that, when a partnership's allocation of an item lacks substantial economic effect, the item should be reallocated to those partners who actually bore the economic effects of the item and that the determination of a partner's interest is a facts and circumstances test. Greenberg could have argued that § 704(b) and its regulations required the Commissioner to allocate GG Capital's partnership items pro rata under the CUPA either before or during trial, but did not do so. We therefore find that the Tax Court did not abuse its discretion in declining to consider this substantive issue at the Rule 155 computations stage.

### 3. Interest Suspension Under I.R.C. § 6404(g)

Greenberg additionally contends that the Tax Court erred in refusing to consider interest suspension under I.R.C. § 6404(g) that the Commissioner purportedly conceded to in the NODs. Turning to the statute, I.R.C. § 6404(g)(1)(A) provides:

> In the case of an individual who files a return of tax imposed by subtitle A for a taxable year on or before the due date for the return (including extensions), if the Secretary does not provide a notice to the taxpayer

specifically stating the taxpayer's liability and the basis for the liability before the close of the 36-month period beginning on the later of—

(i) the date on which the return is filed; or

(ii) the due date of the return without regard to extensions,

the Secretary shall suspend the imposition of any interest, penalty, addition to tax, or additional amount with respect to any failure relating to the return which is computed by reference to the period of time the failure continues to exist and which is properly allocable to the suspension period.

Greenberg points to the statement in the 2004 and 2005 NODs that § 6404(g) applied starting on the date each NOD was issued. He asserts that because the NODs are supposed to represent the Commissioner's determinations, he had no reason to suspect the § 6404(g) interest suspension issue would be eliminated until he received the Commissioner's Rule 155 computations. We reject this argument.

In *Commissioner v. McCoy*, 484 U.S. 3, 7 (1987), the Supreme Court explained that "[i]nterest on a tax deficiency is separately mandated by 26 U.S.C. § 6601(a)," which concerns interest on underpayment of tax. The Supreme Court thus found that the Tax Court and the Court of Appeals lacked jurisdiction to determine interest because the deficiency could not be assessed until after the Tax Court rendered its decision. *Id.* Subsequently, in *United States v. Beane*, 841 F.3d 1273, 1284 (11th Cir. 2016), this Court relied on *McCoy* for the proposition that "when a Tax Court finds the existence of a deficiency, it does not decide other questions such as those related to interest or penalties, as those are outside the scope

78

of the petition to the Tax Court." In doing so, this Court noted that the Tax Court has "strictly limited jurisdiction and powers." *Id.* at 1283 (quoting *Roberts v. Comm'r*, 175 F.3d 889, 896 (11th Cir. 1989)). Indeed, "[a] Tax Court case is not one for collection of taxes but a review of the government's determination of a deficiency by the taxpayer." *Id.* Thus, this Court explained that "[a] deficiency . . . does not include interest on an underpayment." *Id.* at 1284; *see also Kim v. Comm'r*, 679 F.3d 623, 627 (7th Cir. 2012).

And, in *Bourekis v. Commissioner*, 110 T.C. 20 (1998), the IRS moved to dismiss the petitioners' allegations contesting statutory interest after they filed a petition challenging an NOD as to their income tax. The Tax Court first explained that its "jurisdiction to redetermine a tax deficiency generally does not extend to statutory interest under section 6601." *Id.* at 24–25. The Tax Court then specifically reviewed § 6404(g) and rejected the petitioners' argument that the NOD should be treated as a notice of final determination not to abate interest under § 6404(g). *Id.* at 25–26. The Tax Court explained that "like a notice of deficiency, a notice of final determination not to abate interest is a prerequisite to the Court's jurisdiction and serves as a taxpayer's 'ticket' to the Tax Court." *Id.* at 26. Because the IRS did not intend for the issued NOD to serve as a final determination not to abate interest, and noting that petitioners admitted they had not filed a formal request for abatement, the Tax Court declined to treat the notice as one for final determination not to abate

79

interest. *Id.* As such, the Tax Court dismissed the petition as to the § 6404(g) suspension of interest claim. *Id.* at 27.

*McCoy*, *Beane*, and *Bourekis* are instructive. The Tax Court lacked jurisdiction to determine Greenberg's suspension of interest claim under § 6404(g). As the Commissioner explains in his brief, if Greenberg is dissatisfied with the amount of interest ultimately assessed by the IRS, he can ask for relief from the Commissioner, and if the Commissioner formally denies his request for relief, he can follow the interest-abatement procedures in § 6404(h), which provides for judicial review of abatement denials. *See Corbalis v. Comm'r*, 142 T.C. 46, 54–57 (2014); *Kim*, 679 F.3d at 627. We therefore reject this argument.

### 4.    The NOL in Case No. 1335-06

Finally, Greenberg contends that the Tax Court erred by refusing to allow him to amend his petition in Case No. 1335-06 to assert a carryback NOL stipulated to in an unrelated case for subsequent tax years. We disagree.

Tax Court Rule 41(a) permits a party to amend a pleading by leave of the Tax Court, and "leave shall be given freely when justice so requires." "The determination of whether justice requires an amendment is within the sound discretion of the trial court." *Young v. Comm'r*, 926 F.2d 1083, 1087 (11th Cir. 1991). In *Foman v. Davis*, 371 U.S. 178, 182 (1962), which this Court applied to the Tax Rule 41(a) context in *Young*, 926 F.2d at 1087, the Supreme Court, in

discussing the similar Federal Rule of Civil Procedure 15(a),[17] explained that a court may deny amendment in cases "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."

In his March 30, 2015, motion—several years after trial—Greenberg claimed that he and the Commissioner had filed a stipulation of settled issues in an unrelated proceeding involving subsequent tax years.  He asserted that, based on the stipulation, he had "carryback losses from tax years 2004 through 2008, some of which may be eligible for carryback to one or more of the tax years at issue in this case."  The attached stipulation showed that the Commissioner agreed that Greenberg had substantiated deductions for legal fee expenses for the years 2004 through 2008 that would create carryback losses sufficient to eliminate his regular taxes for 2003 and 2004.  The Tax Court denied the motion, explaining that "[t]o the extent it seeks to raise a new issue arising from an alleged [NOL], [it denied] it as proceeding from a lack of due diligence," citing Rule 41.  Greenberg again attempted to raise the NOL during the Rule 155 calculations, but the Tax Court declined to

---

[17] Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave *when justice so requires*." (emphasis added).

consider the issue, explaining that it would "require more fact-finding" and that it was too late to raise the issue.

Greenberg makes limited argument on this issue. He claims that "Tax Court precedent" allows him to raise the NOL for the first time in the Rule 155 computations and speculates that it is "unclear" if he has another forum to raise the NOL. As such, he argues that the Tax Court violated established law and Rule 155. We first note that Greenberg's initial brief does not challenge the Tax Court's finding of a lack of due diligence regarding the March 30, 2015, motion, and we thus find that issue abandoned. *See Sapuppo*, 739 F.3d at 680–81 (explaining that a party must plainly and prominently raise an issue in its briefs and that the failure to do so will result in abandonment of the issue).

Turning to whether the Tax Court abused its discretion in not considering the NOL during the Rule 155 computations, *Knowlton*, 791 F.2d at 1511, we again note that a party is not permitted to raise new issues during the Rule 155 computation process," *Vento*, 152 T.C. at 8. And, even if a matter has computational aspects, it may still be deemed a "new issue," e.g., whether a taxpayer is "entitle[d] to a net operating loss carryback." *Id.* at 9.

We find that the Tax Court did not abuse its discretion in declining to allow Greenberg to raise the NOL during the Rule 155 computations. While the NOL does have computational aspects, the Tax Court would have to reopen the record and

conduct further factfinding to determine whether Greenberg was permitted to carryback an NOL.[18] Greenberg raises *Harris v. Commissioner*, 99 T.C. 121 (1992), to claim that he can raise the NOL during the Rule 155 computations. We find Greenberg's reliance on *Harris* misplaced. In *Harris*, the Tax Court relied on TEFRA partnership provisions to conclude that a taxpayer-partner's NOL carrybacks arising from a settlement of a TEFRA partnership proceeding could be considered in the Rule 155 computation. *See id.* at 126–28. The Tax Court explained that after a settlement has been reached at the TEFRA partnership level, "the substantive partnership level issues have been resolved, and all that remains is the mechanical procedure of applying such settlement to the partner." *Id.* at 126. Unlike *Harris*, however, the NOL stipulated to in the unrelated case would involve the Tax Court allowing Greenberg to amend his petition and would require the Tax Court to decide substantive issues, issues which go well beyond just mechanical application of the settlement. The Tax Court therefore was well within its discretion to decline to entertain the NOL at such a late junction.

## IV.     CONCLUSION

For the reasons explained above, we affirm the Tax Court's decision.

---

[18] Indeed, it is unclear whether Greenberg could even carryback the NOL to the 2001 tax year. The version of I.R.C. § 172(b)(1)(A) in effect at the relevant time periods of this case only permitted a NOL to be carried back two years, with any remaining loss carried forward. Thus, it appears that 2003 is the latest tax year from which Greenberg could carry an NOL back to 2001. And the stipulation in the unrelated case references only the 2004 through 2008 tax years.

**AFFIRMED.**